KENAI PENINSULA BOROUGH SCHOOL DISTRICT and Kenai Peninsula Borough, Appellants,

v.

KENAI PENINSULA EDUCATION ASSOCIATION, Appellee.

ANCHORAGE BOROUGH EDUCATION ASSOCIATION, Appellant,

v.

GREATER ANCHORAGE AREA BOROUGH, ANCHORAGE BOROUGH SCHOOL DISTRICT, Appellee.

MATANUSKA–SUSITNA SCHOOL DISTRICT, Appellant,

v.

MATANUSKA–SUSITNA EDUCATION ASSOCIATION, Appellee.

Nos. 2470, 2492 and 2563.

Supreme Court of Alaska.

Dec. 9, 1977.

will examine the more specific issues later in this opinion. They include such items as class size and the use of teacher specialists and para-professionals. Of the three trial courts which passed on the matter, one ruled in favor of the school boards,[1] one ruled in favor of the teachers' union,[2] and one split the various items, ruling for the board on some and the unions on others.[3]

Allen McGrath and John R. Snodgrass, Jr., of Graham & James, Anchorage, for School Districts.

John R. Strachan, Anchorage, for Education Associations.

Before BOOCHEVER, Chief Justice, and RABINOWITZ, CONNOR, ERWIN and BURKE, Justices.

CONNOR, Justice.

These cases present important questions of labor law and constitutional law concerning the collective bargaining requirements for teachers in the public schools. Two of these cases are before us because the teachers' associations (the unions) have sued school districts and boroughs (the school boards) to compel collective bargaining in good faith under AS 14.20.550. In the third, a school board seeks a declaratory judgment that certain issues are not bargainable. The school boards, while not disputing the unions' right to collective bargaining on a number of employment-related issues, contend that they should not be forced to bargain collectively on various items which they regard as affecting educational policy. Educational policy, the school boards contend, must be determined only by the public through the legislature and, by delegation, through the school boards. We

## I. Introduction

To facilitate the understanding of our more detailed legal discussion later in this opinion, we will summarize at the outset the contentions of the parties. The statutes at issue in this litigation are AS 14.20.550 and .610, which provide:

"Sec. 14.20.550. *Negotiation with certificated employees.* Each city, borough and regional school board, shall negotiate with its certificated employees in good faith on matters pertaining to their employment and the fulfillment of their professional duties. (§ 1 ch 18 SLA 1970; am § 3 ch 71 SLA 1972; am § 21 ch 124 SLA 1975)."

"Sec. 14.20.610. *Legal responsibilities of boards.* Nothing in §§ 550–600 of this chapter may be construed as an abrogation or delegation of the legal responsibilities, powers, and duties of the school board including its right to make final decisions on policies. (§ 1 ch 18 SLA 1970)."

The boards contend, using labor cases from the private sector, that the requirement of collective bargaining in good faith is a term of art in labor law. Unlike a simple "meet and confer" requirement, to negotiate in "good faith" entails a duty to make concessions. Thus, management does

---

1. *Anchorage Borough Ed. Ass'n v. GAAB, Anchorage Borough School Dist.,* No. 2492 (hereinafter Anchorage).

2. *Kenai Pen. Borough Sch. Dist. and Kenai Pen. Borough v. Kenai Pen. Ed. Ass'n,* No. 2470 (hereinafter Kenai).

3. *Matanuska-Susitna Sch. Dist. v. Matanuska-Susitna Ed. Ass'n,* No. 2563 (hereinafter Mat-Su).

not have the final decisions on matters subject to good faith collective bargaining, since if management adheres to its determined policies, it violates the law.

The school boards contend that the submission of educational policies to a good faith collective bargaining requirement would remove the final decisions on such matters from the boards, contrary to the intent of the legislature expressed in AS 14.20.610. The boards contend that to require bargaining on questions of educational policy would also contravene the Alaska Constitution, art. VII, § 1, which makes education the exclusive domain of the legislature.[4] See Macauley v. Hildebrand, 491 P.2d 120 (Alaska 1971). Delegation of part of the decision-making power on educational policy to labor unions is unconstitutional, they urge, because the union is a private organization, unaccountable to the public. The union can use the power for its own ends, and is under no duty to foster educational policies which are in the general public interest.

The unions argue that such delegation is perfectly proper, and that there is no delegation of decision-making power inherent in a labor negotiations requirement. They further argue that they represent professional employees, and that their participation in good faith collective bargaining labor negotiations is an attempt by the legislature to provide professional advice to school boards on the management of the schools. They assert that this is a legislative policy judgment, in no way inimical to the Alaska Constitution. Also relying on labor cases, they discount the importance of

any "management prerogative" to determine educational policy under AS 14.20.610, and assert that labor's concerns with working conditions override any management prerogative as to basic policy.

The unions argue that the Alaska teachers' collective bargaining statutes are more comprehensive than those found elsewhere, and hence the scope of bargaining should be interpreted broadly. The school boards assert that the Alaska Constitution as interpreted in Macauley v. Hildebrand, supra, is more adamant than provisions in other states in placing education firmly within the legislative prerogative. Therefore, collective bargaining must yield across a wide range of issues affecting educational policy.

## II. Scope of the Duty to Bargain

If we were to look to the law concerning bargaining between labor unions and private employers, we would conclude that the scope of negotiable issues is broad. The law relating to the private sector has always contained, and still does contain, uncertainties. But the general trend has been to require that employers bargain in good faith on a wide range of items with respect to wages, hours, and other conditions of employment, without regard to whether the employers consider the items bargained for to be within the prerogatives of management.[5] Moreover, some cases hold that for an employer or a union to avoid being found to have bargained in bad faith, the parties must make some reasonable effort to compose their differences. While the good faith standard of collective bargaining

4. Alaska Constitution, art. VII, § 1 states:
"The legislature shall by general law establish and maintain a system of public schools open to all children of the State, and may provide for other public educational institutions. Schools and institutions so established shall be free from sectarian control. No money shall be paid from public funds for the direct benefit of any religious or other private educational institution."

5. Fibreboard Paper Products Corp. v. N. L. R. B., 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964) (management decision to subcontract

out the work of some employees must be bargained); International Ladies' Garment Workers Union v. N. L. R. B., 150 U.S.App.D.C. 71, 463 F.2d 907 (1972) (decision to relocate the business to another state subject to bargaining); Royal Typewriter Co., 209 N.L.R.B. 1006, 1012 (1974) (decision to close a plant subject to bargaining). But see General Motors Corp., 191 N.L.R.B. 951 (1971), aff'd sub nom., International Union, United Auto. A. & A. Imp. Wkrs. v. N. L. R. B., 152 U.S.App.D.C. 274, 277, 470 F.2d 422, 425 (1972) (decision to sell part of business not bargainable).

does not compel either party to make concessions, intransigent positions, adopted in an effort to avoid any agreement, are disfavored.[6] Thus a legal determination that a matter is subject to good faith collective bargaining may narrow the policy-making powers of an employer by curtailing any absolute directives on his part.

When we turn to employment in the public sector, and particularly in education, the question of what is properly bargainable is thrown into more doubt. If teachers' unions are permitted to bargain on matters of educational policy, it is conceivable that through successive contracts the autonomy of the school boards could be severely eroded, and the effective control of educational policy shifted from the school boards to the teachers' unions. Such a result could threaten the ability of elective government officials and appointive officers subject to their authority, in this case the school boards and administrators, to perform their functions in the broad public interest.[7]

Recently the United States Supreme Court had occasion to comment upon the differences between collective bargaining in the public and private sectors. In *Abood v. Detroit Board of Education*, 431 U.S. 209, 227–28, 97 S.Ct. 1782, 1795–96, 52 L.Ed.2d 261, 279–80 (1977), the Court, speaking through Mr. Justice Stewart, observed:

"A public employer, unlike his private counterpart, is not guided by the profit motive and constrained by the normal operation of the market. Municipal services are typically not priced, and where they are they tend to be regarded as in some sense 'essential' and therefore are often price inelastic. Although a public employer, like a private one, will wish to keep costs down, he lacks an important discipline against agreeing to increases in labor costs that in a market system would require price increases. A public-sector union is correspondingly less concerned that high prices due to costly wage demands will decrease output and hence employment.

The government officials making decisions as the public 'employer' are less likely to act as a cohesive unit than are managers in private industry, in part because different levels of public authority—department managers, budgetary officials, and legislative bodies—are involved, and in part because each official may respond to a distinctive political constituency. And the ease of negotiating a final agreement with the union may be severely limited by statutory restrictions, by the need for the approval of a higher executive authority or a legislative body, or by the commitment of budgetary decisions of critical importance to others.

Finally, decisionmaking by a public employer is above all a political process. The officials who represent the public employer are ultimately responsible to the electorate, which for this purpose can be viewed as comprising three overlapping classes of voters—taxpayers, users of particular government services, and government employees. Through exercise of their political influence as part of the electorate, the employees have the opportunity to affect the decisions of government representatives who sit on the other side of the bargaining table. Whether these representatives accede to

---

6. *Sign and Pictorial Union Local 1175 v. N. L. R. B.*, 136 U.S.App.D.C. 144, 149, 419 F.2d 726, 731 (D.C.Cir. 1969); *N. L. R. B. v. General Electric Co.*, 418 F.2d 736, 756–62 (2d Cir. 1969), *cert. denied*, 397 U.S. 965, 90 S.Ct. 995, 25 L.Ed.2d 257 (1970); *N. L. R. B. v. McLane Co.*, 405 F.2d 483, 484 (5th Cir. 1968); *N. L. R. B. v. Reed & Prince Mfg. Co.*, 205 F.2d 131, 134–35 (1st Cir. 1953), *cert. denied*, 346 U.S. 887, 74 S.Ct. 139, 98 L.Ed. 391 (1953) ("the employer is obliged to make *some* reasonable effort in *some* direction to compose his differences with the union"; emphasis in original); *Majure v. N. L. R. B.*, 198 F.2d 735 (5th Cir. 1952). *See generally* Swerdlow, Freedom of Contract in Labor Law, 51 *Tex.L.Rev.* 1 (1972).

7. As one commentator has noted, "what is in the best interest of the students and the community is not always in the best interests of teachers." Rund, Symposium on Teacher Bargaining: Commentary, 50 *Ind.L.J.* 344, 350 (1975).

a union's demands will depend upon a blend of political ingredients, including community sentiment about unionism generally and the involved union in particular, the degree of taxpayer resistance, and the views of voters as to the importance of the service involved and the relation between the demands and the quality of service."

In a concurring opinion in that case Mr. Justice Powell noted the similarity between a public sector union and a conventional political party:

"The ultimate objective of a union in the public sector, like that of a political party, is to influence public decisionmaking in accordance with the views and perceived interests of its membership. Whether a teachers' union is concerned with salaries and fringe benefits, teacher qualifications and in-service training, pupil-teacher ratios, length of the school day, student discipline, or the content of the high school curriculum, its objective is to bring school board policy and decisions into harmony with its own views. Similarly, to the extent that school board expenditures and policy are guided by decisions made by the municipal, state and federal governments, the union's objective is to obtain favorable decisions—and to place persons in positions of power who will be receptive to the union's viewpoint. In these respects, the public sector union is indistinguishable from the traditional political party in this country."

8. The holding of the majority in *Abood* was that a union shop or agency shop agreement for public employees, requiring all employees in the bargaining unit to make financial contributions to the union, did not violate the first amendment rights of employees who objected to the union. The same rule obtains for unions in the private sector. Although Justice Powell concurred in the majority's decision to remand the case for further proceedings, he disagreed with this constitutional holding. Unlike the majority, he felt that the differences between public and private employment compelled a holding that agency shop or union shop agreements in the public sector are forbidden by the first amendment.

431 U.S. at 256, 97 S.Ct. at 1810, 52 L.Ed.2d at 298.[8]

The legislature was evidently cognizant of this concern when it enacted AS 14.20.-550 and .610, stating two goals which apparently conflict. We must now proceed to interpret what we believe the legislature meant by these provisions.

The school boards initially argue that to make matters of school operation and educational policy subject to collective bargaining amounts to an unconstitutional delegation of governmental power to the unions.

While courts in an earlier era often held laws unconstitutional on the ground that they delegated legislative power to private persons or groups, e. g., *Carter v. Carter Coal Co.*, 298 U.S. 238, 311, 56 S.Ct. 855, 80 L.Ed. 1160 (1936), the trend has been to uphold such delegations, even when the power is delegated to a group with an economic interest in the decisions to be made. *E. g., United States v. Rock Royal Cooperative, Inc.*, 307 U.S. 533, 577–78, 59 S.Ct. 993, 83 L.Ed. 1446 (1939) (cooperative marketing program from agricultural products); *Agricultural Prorate Comm'n v. Superior Court*, 5 Cal.2d 550, 55 P.2d 495, 504–06 (Cal.1936) (same); *Potter v. New Jersey Supreme Court*, 403 F.Supp. 1036, 1039–40 (D.N.J. 1975), *aff'd*, 546 F.2d 418 (3d Cir. 1976) (requirement that attorneys have graduated from law schools accredited by the American Bar Association). *See generally,*

*See generally* Rehmus, Constraints on Local Governments in Public Employee Bargaining, 67 *Mich.L.Rev.* 919 (1969); Shaw and Clark, The Practical Differences Between Public and Private Sector Collective Bargaining, 19 *U.C.L. A.L.Rev.* 867 (1972); Summers, Public Sector Bargaining: Problems of Government Decisionmaking, 44 *U.Cinn.L.Rev.* 669 (1975); Summers, Public Employee Bargaining: A Political Perspective, 83 *Yale L.J.* 1156 (1974); Wellington & Winter, The Limits of Collective Bargaining in Public Employment, 78 *Yale L.J.* 1107 (1969); Project, Collective Bargaining and Politics in Public Employment, 19 *U.C.L.A.L.Rev.* 887, 1010–51 (1972).

1 K. Davis, Administrative Law Treatise § 2.14 (Supp.1970) (collecting cases). *See also* 1 *Id.* § 2.15 (1958).

Furthermore, the statute merely requires the school board to negotiate with the union. It does not require the board to accept any particular proposal the union might offer. It does not require, and probably does not permit, the board to delegate to the union the sole power to make any decision. Therefore, cited cases invalidating outright grants of governmental power to private groups, *e. g., Hetherington v. McHale*, 458 Pa. 479, 329 A.2d 250 (1974), and *Bayside Timber Co. v. Bd. of Supervisors*, 20 Cal.App.3d 1, 97 Cal.Rptr. 431 (1971), are not apposite.

The cases in other states rejecting the argument that collective bargaining with teachers' unions is an unconstitutional delegation of power, all involve statutes which fairly narrowly constrict either the scope of bargainable issues, or the school boards' duty to accede to union proposals, or both. *Chicago Div. of Ill. Ed. Ass'n v. Board of Ed.*, 76 Ill.App.2d 456, 222 N.E.2d 243, 251 (1966); *Joint School Dist. No. 8 v. Wisc. Emp. Rel. Bd.*, 37 Wis.2d 483, 155 N.W.2d 78, 83 (1967); *State v. City of Laramie*, 437 P.2d 295, 300 (Wyo.1968) (firemen). In this opinion, we similarly construe the Alaska statute. A statute defining the scope of collective bargaining as broadly as the union would have us do, might well present a more troubling constitutional question. But we find no constitutional infirmity in AS 14.20.550 and .610. The delegation of power problem still bears upon our task of statutory interpretation, however, for in interpreting the relevant statutes we will not readily assume that the legislature intended to divest the school boards of their power to determine matters of educational policy and school system management.

Courts in other jurisdictions have considered problems similar to those which we confront here. It is instructive, though not determinative, to look to the case law of other jurisdictions as an aid to interpretation.

The court in *Dunellen Bd. of Education v. Dunellen Ed. Ass'n,* 64 N.J. 17, 311 A.2d 737 (1973), dealt with a conflict between a requirement to bargain about "terms and conditions" of employment (without further definition) and the broad managerial power over schools entrusted to local school boards. The court noted that "terms and conditions" of employment without further definition does not furnish a dispositive guideline. It held that the decision whether to consolidate chairmanships of the social studies department and English department was not a subject of mandatory bargaining. It was a matter predominately of educational policy and thereby fell within the exclusive prerogative of management.[9]

*National Ed. Ass'n of Shawnee Mission, Inc. v. Board of Ed.,* 212 Kan. 741, 512 P.2d 426 (1973), is closely analogous to the case at bar. There the teachers' association negotiated under a statute which permitted it to "participate in professional negotiation with boards of education . . . for the purpose of establishing, maintaining, protecting or improving terms and conditions of professional service." The state constitution, like Alaska's, gave the legislature the power to provide for public schools. The negotiations reached an impasse after the board took the position that all matters, whether negotiable under the statute or not, were of a policy nature subject to unilateral change by the board and could not be incorporated into a contract, while the teachers asserted that nearly everything pertaining to school operations was negotiable.

**9.** The teachers' unions in the case at bar argue that *Dunellen* was overruled by later legislation. The statute in question dealt with only a limited aspect of bargaining; and *Dunellen* has been followed by the courts despite the statutory amendment. *See, e. g., Galloway Tp. Bd. of Ed. v. Galloway Tp. Ed. Ass'n,* 135 N.J.Super. 269, 343 A.2d 133 (1975).

On appeal the Kansas Supreme Court was confronted with the same problem that we are: how to frame a test which would delimit those matters which are bargainable from those which are not. The Kansas court held that salaries, vacations, and sick leave are negotiable. In so doing it pointed out that the term "policy" is not helpful, ·because even salaries are a matter of policy. It drew the following distinction:

> "The key, as we see it, is how direct the impact of an issue is on the well-being of the individual teacher, as opposed to its effect on the operation of the school system as a whole." 512 P.2d at 435.

While the *Shawnee Mission* case represents a commendable attempt to balance competing claims, it does not provide a test which is useful in determining the negotiability of specific subjects. In other words, it does not provide any comforting guidance in determining how, in the last analysis, the balance should be weighed between the school boards and the teachers.

Put another way, a matter is more susceptible to bargaining the more it deals with the economic interests of employees and the less it concerns professional goals and methods. Bargaining over the latter topics presents particular problems because there is less likely to be any politically organized interest group other than the union concerned with these issues. The salaries of public employees have a direct financial effect on the taxpayers; on the other hand, a question such as teacher evaluation of administrators is unlikely to have any impact sufficiently direct to be discernible by laymen. Furthermore, it is such an abstract and abstruse subject that it is unlikely that any appreciable portion of the public will either understand it or care greatly about it. In such circumstances, the risk that effective power over the governmental decision will come to rest with the union is significantly greater. Moreover, it is more likely that there will be disagreements among union members on questions of this nature than on "bread and butter" issues; the risk that minority viewpoints within the union will not be meaningfully represented in the bargaining is a real one. *See* Summers, *supra*, 83 *Yale L.J.* at 1181–82, 1194–95. *But see* Wollett, The Coming Revolution in Public School Management, 67 *Mich. L.Rev.* 1017 (1969) (argues that these subjects should be bargainable).

## III. *Specific Issues*

■ We will now consider the Alaska situation in more detail. At the outset it appears to us that questions concerning salaries, the number of hours to be worked, and amount of leave time are all so closely connected with the economic well-being of the individual teacher that they must be held negotiable under our statutes. The troubling question is what other items are bargainable.

■ The various trial courts in these cases considered such items as (1) relief from non-professional chores, (2) elementary planning time, (3) para-professional tutors, (4) teacher specialists, (5) teacher's aides, (6) class size, (7) pupil-teacher ratio, (8) a teacher ombudsman, (9) teacher evaluation of administrators, (10) school calendar, (11) selection of instructional materials, (12) the use of secondary department heads, (13) secondary teacher preparation and planning time, and (14) teacher representation on school board advisory committees.

The testimony adduced in the trial courts does not provide us with much enlightenment as to why any of these items should fall on one side of the line or another. Realistically the two areas, i. e., (1) educational policy, and (2) matters pertaining to employment and professional duties, merge into and blend with each other at many points. Logically and semantically it is nearly impossible to assign specific items to one category and not the other. Certain examples may make this point more clearly.

In the *Mat-Su* case the teachers have asked for a planning period of 45 minutes "to be taken during the academic portion of the day." Were this merely a request for planning time, it might be considered negotiable. The demand that it be during the academic portion of the day, however, presents an additional complication: whether, as a matter of educational policy, elementary school children should have one teacher with them throughout the day or whether they are old enough to be taught by different people. This presents a basic educational decision. While the amount of paid time available to a teacher for preparation of lesson plans affects the teacher directly, the demand that such time be available "during the academic portion of the day" presents a policy question.

Similarly, the question of class size affects directly the amount of work a teacher must perform. But the determination of optimum class size is quite basic to school policy and management, and potentially has a substantial impact on the school district's personnel expenditures. A number of courts have found this to be clearly non-negotiable. *See National Ed. Ass'n of Shawnee Mission, Inc. v. Board of Ed.*, 512 P.2d 426, 435 (Kan.1973); *West Irondequoit Teachers Ass'n v. Helsby*, 35 N.Y.2d 46, 358 N.Y.S.2d 720, 315 N.E.2d 775, 777–78 (N.Y. App.1974); *School Dist. of Seward Ed. Ass'n v. School Dist. of Seward*, 188 Neb. 772, 199 N.W.2d 752, 759 (1972); *City of Biddeford v. Biddeford Teachers Ass'n*, 304 A.2d 387, 403 (Me.1973).

An examination of the other specific items listed above yields equally indefinite answers. We are confronted, then, with a situation in which the legislature has not spoken with clarity and concerning which we possess no expertise. We can only conclude that salaries, fringe benefits, the number of hours worked, and the amount of leave time are negotiable.[10] In view of the concerns expressed on pages 419, 420 *supra*, we conclude that the other specific items listed on page 422 are, under the existing statutory language, non-negotiable.

It would be helpful if the legislature, through future enactments, provided more specific guidance on a number of the items which the unions seek to negotiate. Lacking that guidance, however, we cannot confidently say that the legislature intended any of these items to be bargainable. We cannot, therefore, read the statutes expansively as to the scope of what is negotiable.

■ As to matters which affect educational policy and are, therefore, not negotiable, we believe that there is nevertheless implicit in our statutes the intention that the school boards meet and confer with the unions. It is desirable that the boards consider teacher proposals on such questions. This will encourage teachers to give the boards the benefit of their expertise, and to make their positions known for the board's use in establishing educational policy.

■ One minor question remains. In the *Kenai* case the trial court, in construing the statutes, relied upon the privately expressed opinion, by means of a letter, of a former legislator. The legislator's opinion was not a matter of public record, subject to judicial notice, nor was it introduced in evidence. Even if it were placed in evidence, reliance upon it would be impermissible under *Alaska Public Employees Ass'n v. State*, 525 P.2d 12, 16 (Alaska 1974). Resort to the letter as a means of legal interpretation was, therefore, error.

AFFIRMED IN PART, REVERSED IN PART.

10. In the list of proposals submitted in the *Kenai* case, for example, it appears that some 38 of the 47 proposals would come within the categories of items we have concluded are negotiable. These items are set forth in the appendix to this opinion.

## APPENDIX
## LIST OF NEGOTIABLE AND NON–NEGOTIABLE ITEMS

Those items which are non-negotiable are as follows:

1. Relief from Non-Professional Chores [11]
2. Class Size and Teacher Load
3. Ombudsman
4. Evaluation of Administrators
5. Teacher Aides
6. Para-Professionals
7. PTR Formula
8. Specialists
9. Calendar

Those items which are negotiable are:

1. Recognition
2. Negotiation Procedures
3. Grievance Procedures
4. Salary Schedule Conditions
5. Salary Schedule
6. Automatic Cost of Living
7. Extra Curricular and Extra Duty
8. Extended Contract
9. Additional Educational Employment
10. Life Insurance
11. Health Insurance
12. Liability Insurance
13. Automobile Allowance
14. Tuition/In-Service Workshops
15. Reimbursement for Physical Examinations
16. Sabbatical Leave
17. Career Development
18. Administrative Leave
19. Personal Leave
20. Sick Leave and Bereavement
21. Personal and Sick Leave for Half-Time Employees
22. Unpaid Leave of Absence
23. Maternity Leave
24. Political Leave
25. Duty-Free Lunch
26. Teacher Preparation Periods
27. Monthly Planning Time
28. In-Service Days
29. Discretional Materials
30. Personnel Files
31. Teacher Transfer
32. Teacher Retention
33. Job Openings
34. Reduction of Staff
35. Teacher Contracts
36. Association Rights and Privileges
   (a) Information
   (b) Release Time for Meetings
   (c) Use of School Buildings
   (d) Use of School Equipment
   (e) Supplies
   (f) Mail Facilities
   (g) Subcontracting
   (h) Non jeopardy
   (i) Exclusive Rights
   (j) KPEA Professional Leave
   (k) Dues Deduction/Continuing Membership
   (*l*) Other Deductions
   (m) Conformity to Law
   (n) School Board Agenda
   (o) Preliminary Draft of Budget
37. Agreement Print-up and Dissemination
38. Duration on Contract

**11.** In the *Kenai* case this item was described in the negotiating document as follows:

"RELIEF FROM NON–PROFESSIONAL CHORES

The Board and Association acknowledge that a teacher's primary responsibility is to teach and that his energies should be utilized to this end, therefore, they agree as follows: Teachers shall not be required to perform the following duties:

A. Non-instructional assignments, including but not limited to, supervising of cafeterias, sidewalks, bus loading, or unloading, or playgrounds of more than fifteen (15) minutes daily.

B. Collecting money from students.

C. Cumulative record cards and other clerical and/or custodial functions."

These matters seem so closely related to school board policy as to be non-negotiable. We do not pass upon other conceivable non-professional functions. We also do not know what is specifically meant by "custodial" functions, and do not, therefore, pass upon that aspect of this item.