404 Mich. 268 (1978)
273 N.W.2d 21
CENTRAL MICHIGAN UNIVERSITY FACULTY ASSOCIATION
v.
CENTRAL MICHIGAN UNIVERSITY
Docket No. 59753, (Calendar No. 3).
Supreme Court of Michigan.
Argued May 2, 1978.
Decided December 28, 1978.
Foster, Swift, Collins & Coey, P.C. (by James A. White), for plaintiff.
J. David Kerr, University Counsel, and Clary, Nantz, Wood & Van Orden (by Robert W. White) for defendant Central Michigan University.
Frank J. Kelley, Attorney General, Robert A. Derengoski, Solicitor General, and Francis W. Edwards, Assistant Attorney General, for defendant Michigan Employment Relations Commission.
Amicus Curiae:
Gregory, Van Lopik & Korney for Detroit Police Officers Association.
Decided December 28, 1978. Rehearing denied 406 Mich 1117.
BLAIR MOODY, JR., J.
On April 30, 1973, the academic senate of Central Michigan University passed a resolution adopting a teaching effectiveness program which provided that students, as well as department faculty, evaluate the faculty members. Although the form of and weight to be given the student evaluations in department recommendations were not specified, the program did provide that "[d]epartmental recommendations for reappointment, promotion and tenure should be accompanied by evidence of teaching effectiveness".
*275 On January 28, 1974, the Central Michigan University Faculty Association charged the university with an unfair labor practice. The faculty association claimed that Section I of the teaching effectiveness program was a mandatory subject of collective bargaining and, therefore, it was impermissible for the university to unilaterally adopt the program.
Administrative Law Judge Schlomo Sperka upheld the faculty association's unfair labor practice charge, finding that the university had violated § 10 of the public employment relations act (hereinafter PERA) by unilaterally adopting and implementing the teaching effectiveness program without bargaining with the exclusive, certified collective bargaining agent of its faculty.
The university appealed to the Michigan Employment Relations Commission (hereinafter MERC). In a split decision, the two-member majority reversed Judge Sperka's decision and dismissed the unfair labor practice charge. After discussing the difference between institutions of higher learning and other public employers as related to the scope of bargaining, the MERC majority found the program in question to be predominantly a matter of educational policy and not mandatorily negotiable. MERC reasoned that since Central Michigan University derives its existence from constitutional authority, § 15 of the PERA does not have full application when applied to university employees. Const 1963, art 8, § 6.
The Court of Appeals, over the dissent of the Honorable MICHAEL F. CAVANAGH, upheld the MERC decision. 75 Mich App 101; 254 NW2d 802 (1977). We granted leave to appeal. 401 Mich 831 (1977).
*276 I
The issue on this appeal is whether the elements, procedures and criteria involving evaluations for purposes of reappointment, retention and promotion are "other terms and conditions of employment" within the meaning of the PERA. The crux of this issue is the question whether the nature of the public employment alters the scope of mandatory bargaining.
It is well settled that Michigan's institutions of higher education are public employers subject to the provisions of the PERA. Board of Control of Eastern Michigan University v Labor Mediation Board, 384 Mich 561; 184 NW2d 921 (1971); Regents of the University of Michigan v Employment Relations Comm, 389 Mich 96; 204 NW2d 218 (1973). The duty of a public employer to bargain collectively with the employees' representative is set forth in § 15 of the PERA, patterned after § 8(d) of the National Labor Relations Act[1] (hereinafter NLRA). Section 15 provides, in relevant part:
"A public employer shall bargain collectively with the representatives of its employees as defined in section 11 and is authorized to make and enter into collective bargaining agreements with such representatives. *277 For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment." MCL 423.215; MSA 17.455(15).
In both the PERA and NLRA, the collective bargaining obligation is defined as the mutual duty of labor and management to bargain in good faith with respect to "wages, hours, and other terms and conditions of employment". The subjects included within the phrase "wages, hours, and other terms and conditions of employment" are referred to as "mandatory subjects" of bargaining. Once a specific subject has been classified as a mandatory subject of bargaining, the parties are required to bargain concerning the subject, and neither party may take unilateral action on the subject absent an impasse in negotiations. See generally Morris, ed, The Developing Labor Law, (Washington, D C: Bureau of National Affairs, Inc, 1971), chs 14-16; National Labor Relations Board v Wooster Division of Borg-Warner Corp, 356 US 342; 78 S Ct 718; 2 L Ed 2d 823 (1958); Fibreboard Paper Products Corp v National Labor Relations Board, 379 US 203; 85 S Ct 398; 13 L Ed 2d 233; 6 ALR3d 1130 (1964).
The United States Supreme Court has concluded that one of the primary purposes of the NLRA is labor relations peace and that this objective can best be achieved by adopting a liberal approach to what constitutes a mandatory subject of bargaining. See, for example, Fibreboard Paper Products, supra. Following the Federal courts' approach, Michigan has adopted a broad view of "other terms and conditions of employment". See, for *278 example, Van Buren Public School Dist v Wayne Circuit Judge, 61 Mich App 6; 232 NW2d 278 (1975).
In Detroit Police Officers Ass'n v Detroit, 391 Mich 44, 55; 214 NW2d 803 (1974), this Court looked to the private sector for examples of mandatory subjects of collective bargaining and found:
"[S]uch subjects as hourly rates of pay, overtime pay, shift differentials, holiday pay, pensions, no-strike clauses, profit sharing plans, rental of company houses, grievance procedures, sick leave, work-rules, seniority and promotion, compulsory retirement age, and management rights clauses, are examples of mandatory subjects of bargaining." (Emphasis added.)
Furthermore, after looking to Federal precedent, the Court of Appeals recently held that the subject of promotional standards and the criteria for those standards are mandatory subjects of collective bargaining. See Detroit Police Officers Ass'n v Detroit, 61 Mich App 487; 233 NW2d 49 (1975), lv den 395 Mich 756 (1975).
In the instant case we are asked whether the elements, procedures and criteria involving evaluations for purposes of reappointment, retention and promotion are "other terms and conditions of employment". MCL 423.215; MSA 17.455(15). We conclude that reappointment, retention and promotion criteria are "other terms and conditions of employment" and are a mandatory subject of collective bargaining.
II
Having reached this conclusion, we must now address the critical question whether the nature of the public employment alters the scope of the *279 collective bargaining obligation of particular public employers. The university makes essentially a two-fold argument for excluding the procedures and criteria for reappointment, retention and promotion from the mandatory subject category to which they would otherwise belong. First, the university maintains that the unique status accorded the state universities by constitutional and statutory authority[2] justifies excluding the subject of promotion and retention evaluation criteria from the scope of the mandatory bargaining obligation.
This argument, that specific public employers should be insulated from the collective bargaining obligation of the PERA because of constitutional and statutory grants of authority, was recently advanced in Pontiac Police Officers Ass'n v Pontiac, 397 Mich 674; 246 NW2d 831 (1976). In that case, the municipality of Pontiac argued that to require bargaining concerning grievance and arbitration procedures would interfere with the constitutional and statutory powers[3] vested in home-rule cities. Although three separate opinions were written in that case, all the justices taking part in the decision agreed that the public employer's duty to bargain collectively pursuant to the PERA prevails over conflicting provisions of the charter of a home-rule city.
Therefore, we have previously held that the PERA was intended by the Legislature to supersede conflicting laws and is superimposed even on those institutions which derive their powers from the Constitution itself. The Legislature in adopting the very words of the NLRA chose to adopt the *280 industrial model for public sector collective bargaining. In decreeing that "wages, hours, and other terms and conditions of employment" are mandatory subjects of collective bargaining, the Legislature focused on the effect a particular aspect of the employment relationship has on the employees' status, not the effect it has on the "business", i.e., the effect on educational policies. The statutory test of the PERA is whether the particular aspect of the employment relationship is a "term or condition of employment". Under the act, a particular aspect of the employment relationship is a mandatory subject of collective bargaining, even if it may be said to be only minimally a condition of employment.
As stated in Justice LEVIN'S opinion in Pontiac Police Officers Ass'n, supra:
"If the Legislature deems it appropriate to redefine the scope of the collective bargaining obligation of the public employers generally or of particular public employers and the representatives of their employees to include `wages, hours, and some other terms and conditions of employment', it may do so.
"This Court cannot properly decide ad hoc that what has uniformly been regarded a `condition' of employment is not such a condition as applied to a particular public employer although it continues to be such a condition for other employers, public and private. By eschewing redefinition, we underscore the prerogative of the Legislature to give such consideration as it deems warranted to the claims of public employers that the scope of the collective bargaining obligation impinges unduly on their power to govern." Pontiac Police Officers Ass'n, supra, 684.
Clearly, the PERA was intended to cover all public employees except for civil service employees *281 specifically excluded by constitutional provision.[4] Nearly every conceivable type of job and profession is covered by collective bargaining agreements under the PERA. If institutions of higher education are indeed different from other public employers, the Legislature could have specifically excluded them from coverage under the PERA. Any exemption or exclusion of public employers from the PERA is the Legislature's prerogative, not that of MERC or the appellate courts.
As a result, we find the unique status accorded state universities by constitutional and statutory authority does not alter the scope of their collective bargaining obligation under the PERA. If university professors are truly unique and thus different from other public employees, the Legislature must carve out an exception to the PERA. This Court cannot.
III
Alternatively, the university contends that the incorporation of student evaluations into the criteria for faculty promotion and retention is predominantly a matter of education policy and, therefore, outside the arena of mandatory collective bargaining. We are urged that the case of Regents of the University of Michigan v Employment Relations Comm, 389 Mich 96; 204 NW2d 218 (1973), supports this position. The language from that case, of significance to this dispute, states:
"Because of the unique nature of the University of Michigan, * * * the scope of bargaining by the Association *282 may be limited if the subject matter falls clearly within the educational sphere. Some conditions of employment may not be subject to collective bargaining because those particular facets of employment would interfere with the autonomy of the Regents. For example, the Association clearly can bargain with the Regents on the salary that their members receive since it is not within the educational sphere. While normally employees can bargain to discontinue a certain aspect of a particular job, the Association does not have the same latitude as other public employees. For example, interns could not negotiate working in the pathology department because they found such work distasteful. If the administrators of medical schools felt that a certain number of hours devoted to pathology was necessary to the education of the intern, our Court would not interfere since this does fall within the autonomy of the Regents under Article 8, § 5." Regents, supra, 109. (Emphasis added.)
Thus, the scope of collective bargaining is limited only if the subject matter "falls clearly within the educational sphere". In the instant case, the procedures and criteria adopted affect the retention, tenure and promotion of faculty members. These are clearly matters within the employment sphere, crucial to the employer-employee relationship. They are not matters within the educational sphere as that phrase was used in Regents, supra.
We agree with the analysis of Court of Appeals dissenter Judge MICHAEL CAVANAGH:
"I cannot agree * * * that evaluative criteria for purposes of tenure and promotion are strictly `educational policy'. This matter bears directly on the means by which the administration will determine whether or not untenured faculty members will continue their positions. Surely the criteria for that decision are important to the members of the bargaining unit. While evaluation of teaching effectiveness is not a trivial element of the university's education program, I cannot *283 perceive the method of that evaluation to be integral to the university's mission: to educate. I would strike the balance in favor of the limited obligation to bargain before unilateral imposition of new criteria. This would not block the ultimate adoption of student evaluations as part of the criteria of teaching effectiveness; it would merely impose the reasonable burden upon the university to consult the association and discuss the program before its implementation." (Emphasis added.) Central Michigan University Faculty Ass'n, supra, 114.
Consequently, we reverse the MERC and Court of Appeals majority opinions and reinstate the decision and recommended order of the Administrative Law Judge.
KAVANAGH, C.J., and WILLIAMS, LEVIN, and RYAN, JJ., concurred with BLAIR MOODY, JR., J.
COLEMAN, J.
This appeal concerns the scope of mandatory collective bargaining in public institutions of higher education. A program promoting teaching effectiveness developed by the Academic Senate of Central Michigan University provides the backdrop for the dispute. An element of the program was an intradepartmental evaluation of each faculty member's teaching effectiveness, with some student input. The information obtained was to be made available to the evaluee and those persons making recommendations or decisions regarding reappointment, tenure and promotion.
The program was adopted by the Academic Senate after three years of deliberations and was implemented in various departments before referral to the University Board of Trustees for ratification.
Subsequent to the adoption of the program by the Board of Trustees, the Central Michigan University Faculty Association (Association) filed an *284 unfair labor practice charge against the University. The Association contended that the evaluative criteria and procedures constituted "wages, hours, and other terms and conditions of employment", MCL 423.215; MSA 17.455(15),[1] and were, therefore, mandatory subjects of collective bargaining. Formal adoption of the teaching effectiveness program and its implementing recommendations was alleged to violate § 10 of the public employees relations act (PERA), MCL 423.210; MSA 17.455(10).[2]
The administrative law judge upheld the Association's charge. The Michigan Employment Relations Commission (MERC) determined, however, that the program was "predominantly a matter of education policy not mandatorily negotiable". Consequently, MERC reversed the decision of the administrative law judge and dismissed the complaint. The Court of Appeals affirmed MERC's decision. 75 Mich App 101; 254 NW2d 802 (1977).
We also agree with MERC. The particular facts of this case create issues which impact predominantly upon educational policy rather than upon *285 conditions of employment. The industrial format of PERA presents some difficulties in application to collegial schemes of higher education such as this, in which the faculty is greatly involved in University governance and in which there is also some student input, but the difficulties are not insurmountable. MERC considered the competing policies and correctly decided the case on its facts. We therefore affirm.
I
Central Michigan University is a state institution of higher education. Pursuant to Const 1963, art 8, § 6, it is governed by a Board of Trustees appointed by the Governor. The constitutional grant of supervisory power to the board was implemented by the Legislature. MCL 390.551 et seq.; MSA 15.1120(1) et seq. However, this Court has consistently ruled that PERA applies to state universities.[3]
The forerunner of the existing Academic Senate of Central Michigan University was first established in 1946 and a similar body has existed continuously ever since. On May 20, 1970, the current Academic Senate was formed. It was composed of some 41 faculty members elected by their departmental peers, 15 representatives of the administration (all deans plus the University President and Vice President) and 6 student representatives, elected by the Student Senate. As stated in the preamble to the Senate's Constitution, the basic purpose of the Senate is to "provide a legislative body in the University in which representatives *286 of the Faculty can deliberate in the determination of academic policies".
The Academic Senate is the principal academic (or educational) policy-making body of the University. Some concerns delineated in its Constitution are: admissions, curriculum, degree requirements, faculty participation in selection of administrators, academic freedom, issues of faculty welfare (salaries, insurance, vacations, etc.), University financial policies and planning, and standards for faculty appointment, promotion and tenure. In this way, the faculty of the University takes an active role in what would traditionally be considered management functions in a different setting. The Board of Trustees, while cloaked with de jure responsibility and authority, has delegated much of its role to the Academic Senate. The faculty thus shares authority over many management areas with the board. Indeed, the testimony of Dr. William B. Boyd, President of the University, makes it clear that the teaching effectiveness program became University policy upon passage by the Senate and would have remained so even without the imprimatur of the board.
Since the representative election of September 24, 1969, the Association has been the exclusive bargaining representative for the University faculty. This status was reaffirmed by a collective bargaining agreement covering the period from May 21, 1971 to June 30, 1974. As such, the Association is the agent of the faculty and the University must negotiate with it concerning "wages, hours, and other terms and conditions of employment". MCL 423.215; MSA 17.455(15).
The concept that each academic department should establish a program promoting teaching effectiveness was first proposed to the University *287 Senate (the immediate predecessor to the Academic Senate) on March 23, 1970. The Ad Hoc Committee on Evaluating Teaching Effectiveness was formed on April 27, 1970 and its report was submitted to the Senate on February 22, 1971. The report was then referred to all departments for evaluation, discussion and implementation.
Subsequently, a second committee was authorized to study and make recommendations concerning implementation of the program. This report was submitted on September 25, 1972. The University alleges that high-ranking Association members participated in "shaping the Senate's course of action" during the three years prior to the program's adoption. Also, a new labor agreement was adopted during that period (1971-1974) when everyone concerned had notice. Plaintiff says that makes no difference. The program, "Teaching Effectiveness  Implementing Recommendations", was formally adopted by resolution of the Academic Senate on April 30, 1973. The University Board of Trustees ratified the program verbatim on August 15, 1973, without any formal notification to or discussion with the Association. The Association filed its unfair labor practice charge on January 28, 1974.
The charge alleged that the unilateral adoption of the program violated the mandatory bargaining aspects of PERA. Specific complaints were directed at Part I, which reads:
"I. Implementing recommendations: for departments.
"a. Each academic department should establish not later than one year after the approval of this recommendation, a systematic program for (a) evaluating and (b) improving teaching effectiveness of every faculty member in the department.
"b. All faculty members of the department should *288 participate in determining the instruments and procedures involved in the evaluative process.
"c. Students as well as departmental faculty should evaluate the faculty of said department.
"d. Information obtained about an individual faculty member should be made available to that individual faculty member and to those individuals having the responsibility of making recommendations and/or decisions regarding reappointment, merit pay, tenure, and promotion.
"e. Departmental recommendations for reappointment, promotion and tenure should be accompanied by evidence of teaching effectiveness. This is not to limit the accompanying evidence to data on teaching effectiveness."
Particular concern was expressed over the alleged mandatory inclusion of student evaluations.[4] A student opinion survey had been in existence since 1968. Its use was optional with any particular department. Some departments used the data obtained from the student evaluations when making recommendations regarding faculty reappointment and tenure, while other departments did not consider student opinions.
The Association has made it clear that only Part I of the program is challenged. No objection is proffered concerning the concept of the teaching effectiveness program itself. The charge was directed solely at the unilateral institution of these evaluations as an element of the decision-making process in areas of reappointment, tenure, and promotion (and, allegedly, merit pay).
Although the document at issue purports to apply to merit pay, such was not actually the case. *289 The mechanism for allocating merit increases was controlled by the collective bargaining agreement. The agreement established a University Achievement Increase Committee to develop procedures and criteria for selecting recipients and amounts subject to the approval of the Association and the University. 1971-1974 Agreement, p 28.
Therefore, we will be concerned only with the program's effect upon reappointment, tenure, and promotion.
II
We are asked to decide whether Part I of the teaching effectiveness program is a mandatory subject of collective bargaining, as distinct from a permissive or illegal subject. The Court has recently defined these terms as having the same meaning under PERA as under the NLRA:
"Mandatory subjects of collective bargaining are those within the scope of `wages, hours, and other terms and conditions of employment'. [MCL 423.215; MSA 17.455(15).] If either party proposes a mandatory subject, both parties are obligated to bargain about it in good faith.
"Permissive subjects of collective bargaining are those which fall outside the scope of `wages, hours, and other terms and conditions of employment', and may be negotiated only if both parties agree.
"Illegal subjects are those which even if negotiated will not be enforced because adoption would be violative of the law or of the NLRA." Pontiac Police Officers Ass'n v Pontiac, 397 Mich 674, 679; 246 NW2d 831 (1976).
Detroit Police Officers Ass'n v Detroit, 391 Mich 44, 54; 214 NW2d 803 (1974). See generally Fibreboard Paper Products Corp v National Labor Relations *290 Board, 379 US 203; 85 S Ct 398; 13 L Ed 2d 233 (1964), National Labor Relations Board v Borg-Warner Corp, 356 US 342; 78 S Ct 718; 2 L Ed 2d 823 (1958).
Therefore, the issue is whether Part I of the program encompasses mandatory or permissive subjects of bargaining. To sharpen the issue further, we accept MERC's statement that:
"The scope of bargaining issues in educational institutions has been presented in terms of whether an employer's action or activity is educational policy or a condition of employment. The PERA bargaining obligation, under this theory, applies only to the latter. Under this theory, the issue may be framed in the alternative. If the portion of the `Teaching Effectiveness  Implementing Recommendations' document to which objection is made by the Association is educational policy, the University Board of Trustees had power to adopt and implement it. If, on the other hand, Item I of the `Teaching Effectiveness  Implementing Recommendations' document is a condition of employment, PERA requires collective bargaining before adoption by the Board of Trustees."
The evaluative criteria and procedures, as an element of the teaching effectiveness program  but also bearing upon faculty reappointment, tenure, and promotion  fall into that area of overlap and conflict between the uncontroverted extremes of "educational policy" and "employment conditions". The growth of litigation testing the scope of the bargaining obligation in the public sector of higher education suggests that the majority of disputed items fall into this zone of overlap.
We note that the governing system employed at the University places members of the faculty on both sides of the bargaining table. They make many management decisions within the Academic *291 Senate structure and yet are represented by the Association which challenges these same decisions. The teaching effectiveness program was originated and developed within the Senate structure but is challenged as a creature of the University.
III
As noted above, many courts recently have been asked to decide issues concerning the scope of mandatory bargaining in the public sector. Two basic approaches for resolving the problem have evolved.
Some courts[5] have required bargaining whenever employer actions "significantly relate to", "concern" or "materially affect" conditions of employment.[6] Because this type of test for determining the scope of the bargaining obligation is inherently biased toward mandatory negotiability, it has been observed that:
"This standard [`significant relation' standard] is inadequate because it does not properly recognize the competing interests at stake where there is an overlap between conditions of employment on the one hand and management prerogatives on the other. By focusing on only one-half of the overlap problem, this standard *292 gives undue weight to conditions of employment." Clark, The Scope of the Duty to Bargain in Public Employment, Labor Relations Law in the Public Sector (Knapp, ed, 1977), p 92.
Other courts have adopted a test which attempts to weigh the effects on both management and union prerogatives  the balancing test. The Oregon Court of Appeals recently stated that:
"[T]he appropriate test to be applied in determining whether a proposed subject is a `condition of employment' and therefore a mandatory subject of bargaining is to balance the element of educational policy involved against the effect that the subject has on a teacher's employment." Sutherlin Education Ass'n v Sutherlin School District No 130, 25 Or App 85, 88; 548 P2d 204, 205 (1976).
Courts in Kansas, Pennsylvania and Alaska have also found the balancing standard to be appropriate.[7] We further note that MERC has previously recognized the advantages of the balancing test. In Westwood Education Ass'n v Westwood Community Schools, 7 MERC Lab Op 313, 320 (1972), the majority stated that "[a] balancing approach to bargaining may be more suited to the realities of the public sector than the dichotomized scheme  mandatory and non-mandatory  used in the private sector".
We find that the balancing approach is an evenhanded method for resolving scope questions. It *293 "acknowledges that both parties have significant interests at stake" and "is well suited to a case by case determination of negotiability because it does not begin with a bias". Clark, supra, pp 94-95. Such an approach is particularly appropriate to public sector decision-making in institutions of higher education because of variables not present in the private sector. Therefore, we determine that issues of the scope of mandatory collective bargaining in higher education under PERA shall be resolved by weighing the effects of a given subject upon educational policies against the effects upon the faculty member's interest in "wages, hours, and other terms and conditions of employment".
IV
The document challenged as to Part I states that each academic department should develop a program for evaluating and improving the teaching effectiveness of every faculty member. Student opinions are included as one element of the evaluative process. No particular weight is required. Departmental recommendations "should be" accompanied by "evidence of teaching effectiveness". Such evidence is not limited.
The thrust of Part I is to require documentation of teaching effectiveness so that the individual can have access to concrete bases for a department's recommendation and can be encouraged to improve specific defects. There is nothing novel in using professional rewards (promotion, tenure, reappointment) as a mode of encouragement. Teaching effectiveness data, albeit in a less systematic or above-board fashion, has always been a part of the decision-making process at the University when faculty members seek promotion, tenure or reappointment.
*294 The controversial feature of Part I is the inclusion of student opinions as one element of the evaluation process. All other elements, criteria and procedures are to be developed by each individual department. Moreover, the weight to be given each piece of information when making recommendations is left to the departments. The departments are free to formulate the student evaluation process in any manner they choose. Therefore, the faculty, in their departmental settings, have primary control over implementation of the evaluations and their use.
It is not disputed that the decision to implement a program promoting teaching effectiveness constitutes educational policy. The Association's position is that the elements, criteria, and procedures of the evaluation process affect conditions of employment (reappointment, tenure and promotion) and therefore require prior bargaining. Assuming, arguendo, that reappointment, tenure and promotion are conditions of public employment, we discern only a minimal effect from provisions of the evaluation process adopted by the University.
The only part of the evaluation process which is not left to subsequent faculty formulation is some use of student opinions. However, even the form of and weight to be given the student evaluations in departmental recommendations are left to the faculty. The impact upon conditions of employment from this requirement cannot be said to be anything more than minor, particularly when one notes that departments were using student evaluations in a similar fashion prior to adoption of the program in issue.
Utilization of student evaluations recognizes that those being taught are in a unique position to perceive whether the teacher, for instance, has *295 adequate knowledge of the subject matter and can transmit it to a student, whether a student's appetite for learning and for the process of learning is whetted or blunted, and whether the class participant is bored, discouraged, submerged or inspired. Therefore, student input provides a perspective of educational effectiveness not otherwise available. As such, it is a desirable although not determinative element of a program seeking to improve the quality of education. Moreover, it is a continuation of the growing nationwide acceptance of the student's role in sharing responsibility and even some authority in institutions of higher education. See Campus Employment Relations, Part V: Student Involvements (Tice, ed, Ann Arbor: Institute of Continuing Legal Education, 1976).
Perhaps some tension derives from the fact that an individual's evaluation of teaching effectiveness must by its nature be subjective. Some students may actually be unfair, but that is not a trait exclusive to a few among a predominantly adult group who happen to be students. This may be why the Senate provided such great flexibility in the use by the faculty of all criteria and why all departmental recommendations and supporting material must be provided to the person being evaluated. The core concern is the quality of education  from which the quality of teaching is inseparable.
At the University, the objectives and methods of enhancing the excellence of higher education and assisting the faculty toward effective teaching are within the ambit of educational policy.
We find, therefore, that Part I of the teaching effectiveness program impacts heavily upon matters of educational policy and only peripherally upon conditions of employment. Consequently, it is not a subject of mandatory collective bargaining.
*296 V
Our holding is in accord with decisions in other jurisdictions. In Association of New Jersey State College Faculties, Inc v Dungan, 64 NJ 338; 316 A2d 425 (1974), the New Jersey Supreme Court held that a unilateral implementation of a program for granting tenure and evaluating tenured faculty, including student input, was a matter of major educational policy. The New Jersey version of PERA also requires bargaining over "terms and conditions of employment". 34 NJ Stat Ann 13A-5.3. The Court suggested, however, that it would have been better labor relations policy to have discussed the program with the faculty prior to implementation. We note that the Central Michigan University program was developed exclusively by the Academic Senate itself over a three year period.
An analogous issue was decided by the New York Public Employee Relations Board in In the Matter of Board of Higher Education of City of New York, 7 PERB ¶ 7-3028, p 3042 (1974). After consultations with the faculty union, the Faculty Senate and the Student Senate, the board implemented student participation on the Personnel and Budget Committees of City University of New York. These committees recommended faculty reappointment, tenure and promotion. During subsequent contract negotiations, the faculty union demanded that the students be barred from the committees. The PERB held that student representation was not a subject of mandatory bargaining and noted:
"There is a difference between the role of college teachers as employees and their policy-making function *297 which goes by the name of collegiality. Unlike most employees, college teachers function as both employees and as participants in the making of policy. Because of this dual role, it has been argued elsewhere that they are not entitled to representation in collective bargaining. In Matter of Fordham University, [193 NLRB 134; 78 LRRM 1177 (1971)], the National Labor Relations Board dismissed this challenge to the right of college teachers to representation and pointed out that the two types of interests of college teachers are compatible because they are addressed in different institutional structures. The NLRB specifically noted that the policy-making responsibilities of college teachers are exercised through academic committees and faculty senates, while they remain employees for the purpose of determining their terms and conditions of employment under the National Labor Relations Act.
"We, too, distinguish between the role of faculty as employees and its role as a participant in the governance of its colleges. * * * The right of the faculty to negotiate over terms and conditions of employment does not enlarge or contract the traditional prerogatives of collegiality; neither does it subsume them. These prerogatives may continue to be exercised through the traditional channels of academic committees and faculty senates * * *. We note with approval the observation that, `faculty must continue to manage, even if that is an anomaly. They will, in a sense, be on both sides of the bargaining table'. We would qualify this observation, however; faculty may be on both sides of the table, but not their union."
VI
The present trend of student and faculty involvement in university governance is a fact in our time of rapid change which must be squarely faced. The New York PERB in Board of Higher Education, supra, directs attention to the fact that student participation in faculty evaluation recognizes *298 the interests of those other than employer and employee:
"It would be a perversion of collective negotiations to impose it [mandatory bargaining] as a technique for resolving such disputes and thus disenfranchising other interested groups."
Although there is logic in some of the arguments that collective bargaining in an institution of higher education will eventually eliminate collegiality and block out social and educational interests of any but the employer and employee,[8] we believe it possible to have an external bargaining agent without atrophy of academic agencies such as the Senate.
The balancing test assures, so far as possible, a fair resolution of competing statutory, constitutional *299 and policy considerations. It is an appropriate instrument for piercing the veil of the "gray area" of overlapping responsibilities, objectives and interests.
In the balancing, we can afford some weight to the role of students whose interest as ultimate beneficiaries of University education is real. The prerogatives and autonomy of the board, as appointed public officials, are also given equal consideration with the interests of the faculty. This result is of particular importance given the inherent political nature of collective bargaining in the public sector.[9]
With the Alaska Supreme Court, we are persuaded that it is in the public interest to guard against a shift in the control of educational policy from the boards to the unions through successive rounds of bargaining. That Court said:
"Such a result could threaten the ability of elective government officials and appointive officers subject to their authority * * * to perform their functions in the broad public interest." Kenai Peninsula Borough School District v Kenai Peninsula Education Ass'n, 572 P2d 416, 419 (Alaska, 1977).
We are mindful that our adoption of the balancing test requires some consideration of the scope of bargaining in public institutions of higher learning on a case-by-case basis. This is a proper result, however, given the diversity of such public institutions and student-faculty relationships. It is difficult to compare the shared authority and collegiality of higher education with the aggressive confrontation prevalent between cities and their public *300 employee unions and we make no attempt to do so.
Because MERC's opinion employs the balancing test here approved, we find no procedural or substantive purpose in a remand to weigh opposing interests. The MERC majority in summation said:
"Consistent with the holdings in other jurisdictions and based on the record as a whole, we find that the documentation of teaching effectiveness is predominantly a matter of educational policy not mandatorily negotiable." (Emphasis added.)
The governing system of shared authority and collegiality existing at Central Michigan University is both appropriate to excellence in higher education and conducive to good faculty-administration-student relations.[10] Furthermore, we find that the role to be played by students in governing the University is a matter of educational policy and within the discretion of the board. Consequently, we agree with both MERC and the Court of Appeals.
Affirmed.
FITZGERALD, J., concurred with COLEMAN, J.
NOTES
[1] Section 8(d) of the NLRA, 29 USC 158(d) provides:

"For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession."
Because of the virtually identical language of the two acts, this Court has concluded that the Michigan Legislature intended that Federal precedent would be given great weight in interpreting § 15 of the PERA. Detroit Police Officers Ass'n v Detroit, 391 Mich 44; 214 NW2d 803 (1974).
[2] Const 1963, art 8, §§ 5, 6; Central Michigan University act, MCL 390.554; MSA 15.1120(4).
[3] Const 1963, art 7, §§ 22, 34; home rule cities act, MCL 117.1 et seq.; MSA 5.2071 et seq.
[4] Const 1963, art 4, § 48 provides:

"The legislature may enact laws providing for the resolution of disputes concerning public employees, except those in the state classified civil service."
[1] The bargaining obligation is set forth in MCL 423.215; MSA 17.455(15):

"A public employer shall bargain collectively with the representatives of its employees as defined in section 11 and is authorized to make and enter into collective bargaining agreements with such representatives. For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract, ordinance or resolution incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession."
[2] Section 10, in pertinent part, reads:

"(1) It shall be unlawful for a public employer or an officer or agent of a public employer * * * (e) to refuse to bargain collectively with the representatives of its public employees * * *". MCL 423.210; MSA 17.455(10).
[3] Regents of University of Michigan v Employment Relations Commission, 389 Mich 96; 204 NW2d 218 (1973), Board of Control of Eastern Michigan University v Labor Mediation Board, 384 Mich 561; 184 NW2d 921 (1971).
[4] A dispute over whether the provisions of Part I of the program are imperative or precatory (should versus shall) in nature has fluttered in and out of this litigation. MERC held that the language was only precatory as an alternate basis for dismissing the complaint. The Court of Appeals did not address the issue.
[5] This Court has admittedly also used a similar type of analysis when deciding scope questions in the past. E.g., Pontiac Police Officers Ass'n v Pontiac, 397 Mich 674, 681; 246 NW2d 831 (1976), Detroit Police Officers Ass'n v Detroit, 391 Mich 44, 58; 214 NW2d 803 (1974). By changing our analytic approach for institutions of higher education, as will be discussed infra, we do not intimate that past cases would be decided differently in the future.
[6] E.g., Clark County School Dist v Local Government Employee-Management Relations Board, 90 Nev 442; 530 P2d 114 (1974), Aberdeen Education Ass'n v Aberdeen Board of Education, 88 SD 127; 215 NW2d 837 (1974), Allied Chemical & Alkali Workers v Pittsburgh Plate Glass Co, 404 US 157, 178-179; 92 S Ct 383; 30 L Ed 2d 341 (1971) (private sector). See, also, Los Angeles County Employees Ass'n, Local 660 v Los Angeles County, 33 Cal App 3d 1; 108 Cal Rptr 625 (1973).
[7] National Education Ass'n of Shawnee Mission, Inc v Board of Education of Shawnee Mission, 212 Kan 741, 753; 512 P2d 426, 435 (1973), Pennsylvania Labor Relations Board v State College Area School Dist, 461 Pa 494, 507; 337 A2d 262 (1975), Kenai Peninsula Borough School Dist v Kenai Peninsula Education Ass'n, 572 P2d 416, 422-423 (Alaska, 1977). (Although the Alaska court did not expressly adopt the balancing test, it is clear that the court approved of and used the test.)
[8] If a faculty union could require bargaining over any subject which affected employment conditions, the role of a faculty legislative body would disappear over time. Professor Brown has described the problem as follows:

"Some statutes contain limitations on the scope of bargainable issues, but neither the limitations nor the generalization meets the special problem of a university faculty. That problem, stripped to its essentials, is to prevent the pervasive and traditional areas of faculty academic authority from being absorbed into the newly created collective bargaining process. Once a bargaining agent has the weight of statutory certification behind it, a familiar process comes into play. First, the matter of salaries is linked to the matter of workload; workload is then related directly to class size, class size to range of offerings, and range of offerings to curricular policy. Dispute over class size may also lead to bargaining over admissions policies. This transmutation of academic policy into employment terms is not inevitable, but it is quite likely to occur. Thus, an expert task force of the American Association for Higher Education, in a calm appraisal of the pros and cons of industrial-style collective bargaining for higher education, concluded that an academic agency such as a faculty senate would probably `atrophy' in the shadow of an external bargaining agent. If the faculty considers such an outcome undesirable, it is possible to argue that the bargaining agent, whether external or internal, is after all under the faculty's control  a majority can in due course repudiate it and choose a new one. But this may be easier prescribed than accomplished." Brown, Collective Bargaining in Higher Education, 67 Mich L Rev 1067, 1075-1076 (1969).
[9] See, e.g., Summers, Public Employee Bargaining: A Political Perspective, 83 Yale LJ 1156 (1974); Project, Collective Bargaining and Politics in Public Employment, 19 UCLA L Rev 887 (1972).
[10] See Leslie, Faculty in Governance: A Rationale, Campus Employment Relations (Tice, ed, Ann Arbor: Institute of Continuing Legal Education, 1976), p 171.