GIBRALTAR SCHOOL DISTRICT v GIBRALTAR
MESPA-TRANSPORTATION

Docket No. 92723. Argued January 12, 1993 (Calendar No. 7). Decided
    August 20, 1993.

> The Michigan Education Support Personnel Association, which
> had been newly certified to represent transportation and custo-
> dial and maintenance employees of the Gibraltar School Dis-
> trict, filed unfair labor practice charges against the district,
> claiming that its refusal to arbitrate grievances under previous,
> expired contracts while the parties negotiated successor agree-
> ments, were unilateral actions without notice and were effected
> in contravention of its statutory duty under the public employ-
> ment relations act to bargain in good faith with respect to
> wages, hours, and other terms and conditions of employment. A
> hearing referee dismissed the charges, finding that the associa-
> tion had no standing to file the charges because the previous
> contracts had expired before the association was certified as the
> employees' bargaining representative, and that no present or
> past contractual obligation was owed by the district to arbitrate
> the grievances. The Michigan Employment Relations Commis-
> sion affirmed. The Court of Appeals, WAHLS, P.J., and DOCTOROFF
> and G. S. ALLEN, JR., JJ., affirmed in an unpublished opinion
> per curiam, finding that the expired agreements had never
> been extended formally by the parties and that the school
> district had no contractual obligation with the newly certi-
> fied union to submit the grievances to arbitration (Docket
> No. 116964). The association appeals.
>
> In an opinion by Justice BOYLE, joined by Justices BRICKLEY,
> RILEY, and GRIFFIN, the Supreme Court held:
>
> The public employment relations act does not create a statu-
> tory duty to arbitrate grievances arising after the expiration of
> a collective bargaining agreement, and the grievances in this

REFERENCES

Am Jur 2d, Labor and Labor Relations §§ 1773, 1787, 1790, 1838,
    1842, 1844.
See ALR Index under Arbitration and Award; Labor and Employ-
    ment; Public Officers and Employees.

case did not accrue or vest under the previous collective bargaining agreement.

1. Grievances that arise after certification of a new union depend for resolution on the PERA, not the expired collective bargaining agreement. Thus, the MESPA had standing to assert a statutory violation and file an unfair labor practice charge. However, under the PERA, there is no statutory duty to arbitrate after expiration of a collective bargaining agreement.

2. Any rights to arbitrate under the arbitration clause of an otherwise expired agreement are those that the parties intended should last beyond the expiration date or that accrue or vest during the term of the agreement. In this case, there was no showing that the parties intended arbitration to survive beyond its expiration date, and it was not argued that the grievances had accrued or vested.

Affirmed.

Chief Justice CAVANAGH, joined by Justices LEVIN and MALLETT, concurring in part and dissenting in part, stated that a contractual provision for arbitration survives the expiration of a collective bargaining agreement as a term and condition of employment under the PERA. The PERA compels a public employer to bargain collectively with its employees' representatives in good faith with respect to mandatory subjects of bargaining. Neither party may take unilateral action regarding a mandatory subject absent impasse. In this case, there was no impasse at the time the district extinguished the arbitration procedure, a mandatory subject of bargaining. The employees' status as public employees compels rejection of federal precedent interpreting the NLRA and its effect on private employees. Because the district unilaterally changed the arbitration process before reaching an impasse in negotiations with the newly certified union, it violated the PERA.

1. LABOR RELATIONS — ARBITRATION — PUBLIC EMPLOYMENT RELATIONS ACT — COLLECTIVE BARGAINING — EXPIRED CONTRACTS.

The public employment relations act does not create a statutory duty to arbitrate grievances arising after the expiration of a collective bargaining agreement.

2. LABOR RELATIONS — ARBITRATION — COLLECTIVE BARGAINING — EXPIRED CONTRACTS.

Any rights to arbitrate under the arbitration clause of an otherwise expired agreement are those that the parties intended should last beyond the expiration date or that accrue or vest during the term of the agreement.

*Cox & Hodgman* (by *Jamil Akhtar*) for the plaintiff.

*Amberg, McNenly, Zuschlag, Firestone & Lee, P.C.* (by *Steven J. Amberg* and *Joseph H. Firestone*), for the defendants.

BOYLE, J. The question presented is whether an arbitration clause of a collective bargaining agreement survives the expiration date of the collective bargaining agreement which created it. We are persuaded by the strong precedent favoring arbitration as being consensual that an agreement to arbitrate does not survive expiration of a collective bargaining contract statutorily as a term or condition of employment under the public employment relations act. The obligation to arbitrate grievances postcontract encompasses grievances involving employee rights that accrue or vest under the contract, or situations in which the parties expressly provided for arbitration beyond the term of the agreement.

We affirm the decision of the Court of Appeals.

I

The Gibraltar school transportation employees, as well as its custodial and maintenance employees, were previously represented in bargaining with the school district by the American Federation of State, County and Municipal Employees. Each unit's contract contained a four-step grievance procedure with arbitration as the final step to resolve "[a]ny grievance or dispute which may arise between the parties concerning the application, meaning or interpretation" of the agree-

ment.[1] Although each contract contained a broad automatic renewal clause,[2] neither included any specific language providing for survival of arbitration in the event the entire contract expired. The

[1] AFSCME Custodial and Maintenance Agreement, art 7, p 4 and Transportation Agreement, art VII, § 1, p 4. The agreements expressly recognized that the sole parties to the contracts were the Board of Education of the Gibraltar School District and AFSCME, the exclusive bargaining representative for the employees. Each contract also provided that it was the complete agreement between the parties with respect to all terms and conditions of employment that would prevail *during* the term of the agreement between the parties. AFSCME Custodial and Maintenance Agreement, arts 1 and 34, pp 1, 23; AFSCME Transportation Workers Agreement, arts I and XXXVI, pp 1, 26.

[2] The AFSCME Custodial and Maintenance Agreement, art 35, labeled "Termination of Agreement," provided:

> This Agreement shall remain in full force and effect until June 30, 1985. It shall be automatically renewed from year to year, *unless* either party shall notify the other party, in writing, at least ninety (90) days prior to June 30, 1985 that it desires to revise or modify this Agreement. In the event that such notice is given, negotiations shall begin not later than sixty (60) days prior to the anniversa[r]y date.
>
> This Agreement shall remain in full force and be in effect during the period of negotiations and until notice of termination of this Agreement is provided to the other party in the manner set forth in the following paragraph:
>
> In the event that either party desires to terminate this Agreement, written notice must be given to the other party not less than ten (10) days prior to the desired termination date, which shall not be before the anniversa[r]y date set forth in the preceding paragraph. [Emphasis added.]

A provision in the AFSCME transportation contract, art XXXVII, contained similar automatic renewal language. However, it did not provide for a stay of termination during the period of negotiations:

> This Agreement shall continue in full force and effect until June 30, 1984. If either party desires to terminate or amend this Agreement, it shall ninety (90) days prior to the above termination date, give written notice of termination or amendment. If neither party shall give notice, or if each party giving notice of termination or amendment withdraws the same prior to the above termination date, this Agreement shall continue in effect from year to year thereafter subject to notice of termination or amendment by either party on ninety (90) days written notice prior to current termination date.

transportation unit's contract expired on June 30, 1984, and the custodial and maintenance unit's contract terminated on June 30, 1985. Although the record is void of any evidence that the contracts were renewed by virtue of the contracts' automatic renewal provisions, we make the logical inference that they were not, in light of the subsequent election and certification of a new bargaining agent for both labor units.[3]

The Michigan Education Support Personnel Association (MESPA) petitioned the Michigan Employment Relations Commission for recognition as the

---

[3] The public employment relations act prohibits the commission from conducting an election or certifying a bargaining agent when a valid collective bargaining agreement exists. Section 12 of the act, MCL 423.212(b); MSA 17.455(12)(b), provides that when a petition for recognition of bargaining representation is filed with the commission:

> The commission shall investigate the petition and, if it has reasonable cause to believe that a question of representation exists, shall provide an appropriate hearing after due notice. If the commission finds upon the record of the hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof. Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with the rules of the commission.

Section 14 of the act, MCL 423.214; MSA 17.455(14), provides in part:

> An election shall not be directed in any bargaining unit or subdivision thereof where there is in force and effect a valid collective bargaining agreement which was not prematurely extended and which is of fixed duration. A collective bargaining agreement shall not bar an election upon the petition of persons not parties thereto where more than 3 years have elapsed since the agreement's execution or last timely renewal, whichever was later.

As noted above, the commission will not conduct an election while a valid collective bargaining agreement is in force. In addition, testimony before the hearing officer revealed that both the school district and the newly certified union agreed that the AFSCME contracts had expired and that the employees were working without contracts. For these reasons, we reject outright MESPA's contention that even though the contracts were expired, all of the terms and conditions were not terminated by virtue of the contracts' automatic renewal provisions.

exclusive bargaining agent for both labor units. The MESPA prevailed over the AFSCME in an August 26, 1985, consent election and was certified as the sole bargaining representative by the MERC on September 9, 1985. Negotiations for new contracts between the school district and the MESPA began the following day. According to the union's representative, the school district's representative verbally assured them that they would "extend the contracts," despite the fact that both parties acknowledged that the AFSCME contracts had expired and both units were currently working without contracts.[4]

On October 18, 1985, the school district offered the MESPA a written contract that included a four-step grievance procedure with arbitration as the final step. The provision was conditioned on the union's agreement to a no-strike clause. At that time, the school district proposed an interim grievance procedure that did not contain arbitration. After the MESPA objected to the interim plan, the school district withdrew its proposal and indicated it would adhere to the grievance procedure established under the expired AFSCME contract, with the exception of arbitration as a final step. The parties continued to negotiate without reaching impasse on any subject of bargaining. Ultimately, agree-

[4] Conversely, Mr. Michael Williamson, superintendent of the school district testified:

> MESPA was a new union. We recognized a need to continue those rights that adhered to the individual, as provided in an agreement negotiated with another union; however, it was the position of the employer that we were dealing with a new union, and rights that adhered to the union needed to be negotiated anew.

When questioned specifically whether the school district recognized the previously existing contracts as continuing to exist as an MESPA contract, Mr. Williamson replied, "Absolutely not. That was an AFSCME contract."

ments for both units were reached and the contracts ratified by the Gibraltar School Board on October 14, 1986.

Meanwhile, the MESPA filed several grievances with the school district during the period between October 24, 1985, and February 3, 1986. Citing the provisions of the expired AFSCME contract, the grievances alleged violations concerning bus run assignments, payment for runs, working hours, payment for layover time, schedule changes, outside employees performing bargaining unit work, and the assignment of a bargaining unit position. Unable to achieve resolution after processing the grievances through the initial three steps of the AFSCME procedure, the union filed a demand for arbitration with the American Arbitration Association, claiming a right to arbitration, pursuant to the expired AFSCME contract.[5] The school district refused the demands for arbitration, stating that no current labor contract existed between the parties granting the association or any third party the authority to process such demands. It also complained that the written arbitration provisions attached to the union's arbitration demands were excerpts from the expired AFSCME contract to which the MESPA was not a party. Arbitration of the grievances was stayed pending resolution of the issue of the right to arbitration itself.

On February 20 and May 13, 1986, the MESPA filed unfair labor practice charges against the school district pursuant to § 10 of the public employment relations act, 1965 PA 379, as amended,

---

[5] The MESPA completed the association's arbitration demand forms indicating that it was "a party to an arbitration agreement contained in a written contract" providing for arbitration, and attached the relevant portions of the expired AFSCME contract. It appears the union had difficulty determining the date of the written contract it purportedly was relying on because it listed a variety of dates on the arbitration demand forms, such as "1982," "to 1986," "1985-1986," "ending 1986," and "continuing."

MCL 423.210; MSA 17.455(10). Specifically, the union claimed that the parties, by agreement, had been working under the last "mutually agreed to collective bargaining agreement, dated February 9, 1982, while the parties engage[d] in negotiations for a successor agreement." The MESPA charged that the school district's refusal to arbitrate grievances were unilateral actions "without notice and were effectuated in contravention of its statutory duty under the PERA to bargain in good faith with Charging Party with respect to wages, hours and other terms and conditions of employment and constitute[d] a continuing effort by [the Gibraltar School District] to undermine the status of [the MESPA] as bargaining representative for the employees represented by [the MESPA]."

The charges were consolidated and a hearing conducted before a hearing referee who found that the MESPA had no standing to file the charges. He rejected the MESPA's theory that the employer repudiated its contractual obligation to arbitrate, because, by its own terms, the contract had expired before the union was certified as the employees' bargaining representative. Finding no present or past contractual obligation to be owed by the school district to arbitrate the grievances at issue, the hearing referee dismissed the charges. The MERC upheld the hearing referee's findings and dismissal order.

The MESPA appealed as of right in the Court of Appeals, which affirmed in an unpublished per curiam opinion, decided October 17, 1991 (Docket No. 116964). The Court found that the expired agreements were never formally extended by the parties and that the school district had no contractual obligation with the newly certified union to submit the grievances to arbitration.

We granted leave to appeal. 440 Mich 889 (1992).

II

A

Before turning to the central issue in this case, we deal briefly with the contention that the MESPA lacked standing to enforce the arbitration provisions of the expired contract. We conclude that such a contention is inappropriate for the issue of the statutory obligation to arbitrate. In this context, "standing" refers to the authority of a newly certified union to litigate rights originally acquired by the predecessor union, usually under a collective bargaining agreement or because of actions or omissions relating to the predecessor union's status as collective bargaining representative of the unit. In this case, the charging parties were certified after the expiration of the collective bargaining agreements. During this period, the terms and conditions of employment are continued because of the statutory obligation to bargain, *Detroit Police Officers Ass'n v Detroit,* 391 Mich 44, 54-55; 214 NW2d 803 (1974). Grievances that arise after certification of the new union depend on the statutory obligation, not the expired collective bargaining agreement. Any question concerning the authority of the newly certified union to enforce rights granted by the expired agreement is irrelevant. Thus, we reject the claim that the MESPA does not have standing to claim a statutory violation and file an unfair labor practice charge.

B

The central question posed is the extent to which an arbitration clause of a collective bargaining agreement survives the expiration date of a collective bargaining agreement. This issue was recently addressed by the United States Supreme Court in the context of private sector disputes

under the National Labor Relations Act, 29 USC 151 *et seq.*; *Litton Financial Printing Div v NLRB,* 501 US 190; 111 S Ct 2215; 115 L Ed 2d 177 (1991). We have long recognized that Michigan's public employment relations act, MCL 423.201 *et seq.*; MSA 17.455(1) *et seq.,* is modeled on the NLRA. Although not controlling, we look to federal precedent developed under the NLRA for guidance in our interpretation of the PERA, *Central Michigan Univ Faculty Ass'n v Central Michigan Univ,* 404 Mich 268; 273 NW2d 21 (1978); *Pontiac Police Officers Ass'n v Pontiac (After Remand),* 397 Mich 674; 246 NW2d 831 (1976); *Detroit Police Officers Ass'n v Detroit, supra* at 53. Thus, *Litton* is an appropriate place to begin our inquiry.

In *Litton,* the expired collective bargaining agreement contained a two-step grievance procedure with arbitration as the final step. During the hiatus between contracts, and without consulting the union, the employer eliminated a portion of its operations and laid off workers. The union demanded grievance procedures and arbitration concerning the layoffs pursuant to the terms of its prior contract with the employer. The employer refused to process or arbitrate the grievances. The NLRB upheld the union's charge of an unfair labor practice and ordered grievance procedures and arbitration. The Supreme Court granted the employer's petition limited to the issue of the right to arbitration postcontract.[6] Justice Kennedy's opinion for the Court differentiates two sources for imposing an obligation on an employer to arbitrate a dispute arising after the expiration date of one collective bargaining agreement but before the

---

[6] The Court did not address the NLRB's finding that Litton committed an unfair labor practice by its unilateral abandonment of the grievance process and wholesale repudiation of any postexpiration arbitration obligations because the employer did not raise the issue in its petition on appeal. *Litton,* 111 S Ct 2220.

effective date of any successor agreement.[7] These sources might be called the statutory obligation and the contract obligation.

The statutory obligation is found in §§ 8(a)(5) and 8(d) of the NLRA, 29 USC 158(a)(5) and (d), which require an employer to bargain "in good faith with respect to wages, hours, and other terms and conditions of employment."[8] As the Court stated in *Litton:*

> The [NLRB] has determined, with our acceptance, that an employer commits an unfair labor practice if, without bargaining to impasse, it effects a unilateral change of an existing term or condition of employment. See *NLRB v Katz,* 369 US 736; 82 S Ct 1107; 8 L Ed 2d 230 (1962). In *Katz* the union was newly certified and the parties had yet to reach an initial agreement. The *Katz* doctrine has been extended as well to cases where, as here, an existing agreement has expired and negotiations

[7] The facts of this case suggest a third possible source of an obligation to arbitrate, a postexpiration agreement by the parties, see n 4 and accompanying text. More typically, the parties might negotiate that any successor agreement might be retroactive to the date of the expiration of the prior agreement, with the intent that pending, unresolved grievances might be submitted to arbitration under the successor agreement.

[8] The corresponding section of the PERA, MCL 423.215; MSA 17.455(15), also requires:

> A public employer shall bargain collectively with the representatives of its employees as defined in section 11 and is authorized to make and enter into collective bargaining agreements with such representatives. For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract, ordinance or resolution incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession.

on a new one have yet to be completed. See, e.g., *Laborers Health and Welfare Trust Fund v Advanced Lightweight Concrete Co,* 484 US 539, 544, n 6; 108 S Ct 830; 98 L Ed 2d 936 (1988). [*Litton,* 111 S Ct 2221.]

Among the mandatory subjects of bargaining is grievance resolution, including arbitration, *United States Gypsum Co v Int'l Woodworkers of America, CIO,* 94 NLRB 112, 131 (1951).[9] While the NLRB has ruled that most mandatory subjects of bargaining are within the *Katz* rule, it has created several exceptions, among which is grievance arbitration, *Hilton-Davis Chemical Co v Int'l Chemical Workers Union,* 185 NLRB 241 (1970).

The United States Supreme Court, with significant deference to the NLRB's interpretation of the NLRA, likewise extended by this Court to the MERC,[10] summarized and quoted from *Hilton-Davis* as follows:

> [T]he Board determined that arbitration clauses are excluded from the prohibition on unilateral changes, reasoning that the commitment to arbitrate is a "voluntary surrender of the right of final decision which Congress . . . reserved to the parties. . . . [A]rbitration is, at bottom, a consensual surrender of the economic power which the parties are otherwise free to utilize." [*Hilton-Davis*] at 242. The Board further relied upon our statements acknowledging the basic federal labor law policy that "arbitration is a matter of contract and a party cannot be required to submit to arbi-

---

[9] This jurisdiction has similarly deemed grievance procedures and arbitration as mandatory subjects of bargaining. See *Ottawa Co v Jaklinski,* 423 Mich 1; 377 NW2d 668 (1985); *Pontiac Police Officers Ass'n v Pontiac (After Remand),* 397 Mich 674; 246 NW2d 831 (1976).

[10] *MERC v Detroit Symphony Orchestra,* 393 Mich 116, 124; 223 NW2d 283 (1974); *Amalgamated Transit Union, Local 1564, AFL-CIO v Southeastern Michigan Transportation Authority,* 437 Mich 441, 450; 473 NW2d 249 (1991).

tration any dispute which he has not agreed so to submit." *United Steelworkers of America v Warrior & Gulf Navigation Co,* 363 US 574, 582; 80 S Ct 1347; 4 L Ed 2d 1409 (1960). See also 29 USC 173(d) (phrased in terms of parties' agreed upon method of dispute resolution under an existing bargaining agreement.) [*Litton,* 111 S Ct 2222.]

A unanimous court in *Litton*[11] agreed that there is no statutory right to arbitration under the NLRA and refused the invitation to reject the NLRB's decision, relying almost totally on the consensual nature of arbitration:

> We think the Board's decision in *Hilton-Davis Chemical Co,* is both rational and consistent with the Act. The rule is grounded in the strong statutory principle, found in both the language of the NLRA and its drafting history, of consensual rather than compulsory arbitration. See *Indiana & Michigan* [*Electric Co v Local Union No 1392, Int'l Brotherhood of Electrical Workers,* 284 NLRB 53, 57-58 (1987)]; *Hilton-Davis Chemical Co, supra.* The rule conforms with our statement that "[n]o obligation to arbitrate a labor dispute arises solely by operation of law. The law compels a party to submit his grievance to arbitration only if he has contracted to do so." *Gateway Coal Co v Mine Workers,* 414 US 368, 374; 94 S Ct 629; 38 L Ed 2d 583 (1974). We reaffirm today that under the NLRA arbitration is a matter of consent, and that it will not be imposed upon parties beyond the scope of their agreement.
>
> In the absence of a binding method for resolution of postexpiration disputes, a party may be relegated to filing unfair labor practice charges with the Board if it believes that its counterpart

---

[11] Justices Marshall and Stevens, joined by Justices Blackmun and Scalia, dissented in *Litton* but all agreed with the majority that there was no statutory right to arbitrate labor disputes. See *Litton,* 111 S Ct 2231, n 4 (Marshall, J., dissenting), and 111 S Ct 2231 (Stevens, J., dissenting).

has implemented a unilateral change in violation of the NLRA. If, as the Union urges, parties who favor labor arbitration during the term of a contract also desire it to resolve postexpiration disputes, the parties can consent to that arrangement by explicit agreement. Further, a collective-bargaining agreement might be drafted so as to eliminate any hiatus between expiration of the old and execution of the new agreement, or to remain in effect until the parties bargain to impasse. Unlike the Union's suggestion that we impose arbitration of postexpiration disputes upon parties once they agree to arbitrate disputes arising under a contract, these alternatives would reinforce that statutory policy that arbitration is not compulsory. [*Litton,* 111 S Ct 2222-2223.]

Federal authority is not the only source of guidance on this question. We have the benefit of the decision of the MERC in this case, which was decided before the Supreme Court issued its opinion in *Litton.*[12] The MERC was forced to use the principles announced in *Nolde Bros, Inc v Local 358, Bakery & Confectionery Workers Union, AFL-CIO,*

[12] In *Ottawa Co v Jaklinski,* n 9 *supra,* this Court addressed the issue of postexpiration arbitration. There, a deputy sheriff lost her position after expiration of a contract and after impasse in negotiations led to a petition for interest arbitration under 1969 PA 312, MCL 423.233; MSA 17.455(33). The facts led to three possible sources for an obligation to arbitrate after expiration. The first was that an employer had to maintain mandatory subjects of bargaining, including arbitration, during negotiations until impasse. We stated that "this line of reasoning . . . logically follows" but rejected the argument because the parties had bargained to impasse. *Id.* at 13. This statement about the logic of the argument was not an acceptance of the doctrine into Michigan law. The second possible source of the obligation in *Jaklinski* was the requirement of 1969 PA 312, § 13, MCL 423.243; MSA 17.455(43), that wages, hours, and other conditions of employment not be changed without consent of the parties during the pendency of Act 312 interest arbitration proceedings. This discussion prompted a dissent. However, it is not relevant to the present case, because Act 312 only applies to certain public safety employees. The third possible source of the obligation discussed in *Jaklinski* is the *Nolde Bros, Inc v Local 358, Bakery & Confectionery Workers Union, AFL-CIO,* 430 US 243; 97 S Ct 1067; 51 L Ed 2d 300 (1977), contract obligation. We discuss this in part II(D).

430 US 243; 97 S Ct 1067; 51 L Ed 2d 300 (1977), the lead case on contract obligation post collective bargaining agreement, as well as NLRB authority implementing *Nolde Bros,* and our decision in *Ottawa Co v Jaklinski,* 423 Mich 1; 377 NW2d 668. (1985), which also drew on *Nolde Bros.* However, the MERC, as a matter of interpreting the PERA, reached a conclusion that matches *Litton's* interpretation of the NLRA. Citing with approval *Indiana & Michigan, supra,* an NLRB decision applying *Nolde Bros,* the MERC stated, "[A]n employer's obligation to arbitrate post-contract extends only to those hiatus grievances which involve 'vested or accrued rights,'" that is, rights under the contract obligation. See part II(D).

Recognizing our historical inclination to be favorably influenced by decisions of the MERC applying the PERA, and the persuasive force of federal authority applying the NLRA, appellants seek to distinguish the circumstances present in private employment from those of the public sector. They contend:

> While it is true that in the private sector both parties are free to utilize economic power, such a balance does not exist in public employment in Michigan. Under federal law, arbitration is considered the *quid pro quo* for an agreement not to strike.

Michigan public employees have no legal right to strike, even after the expiration of a collective bargaining agreement, MCL 423.202; MSA 17.455(2). While we acknowledge this truism, we are persuaded both by the structure of the statute and the realities of public sector employment that the MERC's conclusion is correct.

First, the consideration of the power to strike

was not the basis for *Litton's* adherence to *Hilton-Davis Chemical.* Rather, the Court was influenced by "the strong statutory principle, found in both the language of the NLRA and its drafting history, of consensual rather than compulsory arbitration." *Litton,* 111 S Ct 2222. The consensual nature of grievance arbitration is no less important in this state, as Justice RILEY has explained:

> The legal basis underlying [the] policy of judicial deference [in reviewing the merits of an arbitration award] is grounded in contract: the contractual agreement to arbitrate and to accept the arbitral decision as "final and binding." Labor arbitration is a product of contract, and, therefore, its legal basis depends entirely upon the particular contracts of particular parties. Arbitration contracts may vary, according to their specific terms, in the scope of the matters entrusted to final and binding arbitration, and in the arbitral authority conferred to resolve disputes concerning such matters. An arbitrator's jurisdiction and authority to resolve a particular dispute concerning the appropriate interpretation of a collective bargaining agreement derives exclusively from the contractual agreement of the parties; an arbitrator possesses no general jurisdiction to resolve such matters independent of the arbitration contract. [*Port Huron Area School Dist v Port Huron Ed Ass'n,* 426 Mich 143, 150-151; 393 NW2d 811 (1986).]

Second, the consideration of the power to strike was only one of three rationales in *Hilton-Davis Chemical, supra.* The other two were the consensual nature of arbitration and "the right of final decision which Congress . . . reserved to [the] parties." *Id.* at 242. The essential nature of both the NLRA and the PERA is that the acts provide only a process by which the parties might reach agreement, the power to agree to a proposal remains

with each party, MCL 423.215; MSA 17.455(15), 29
USC 158(a)(5) and (d).[13]

Additionally, and most importantly, the Legisla-
ture has made the determination when, after expi-
ration of a collective bargaining agreement, public
employees' lack of the right to strike creates an
imbalance of power that is contrary to public
interest. It determined that an imbalance affected
only certain types of public safety employees,
whom it gave the right to interest arbitration in
1969 PA 312; MCL 423.233; MSA 17.455(33). It
thus appears that the Legislature did not believe
that a purported imbalance in other public sector
employment required adjustment. The dissent's
suggestion that we have failed to acknowledge that
Act 312 supplements the PERA is thus wide of the
mark. We do not dispute or fail to acknowledge
the purpose of Act 312. Rather, we draw the
inference that the Legislature did not intend arbi-
tration to be part of the statutory contract from
the fact that it concluded that the danger of
strikes required only a limited response not ex-
tended to public employees in general.

Turning to the context of general public sector
employment, while the balance of negotiating
power is different than in the private sector, we
reject the implication that public employees are as
disadvantaged by the differences as the charging

---

[13] See also *Pontiac Police Officers Ass'n, supra* at 683, where Justice
LEVIN observed that the PERA "does not obligate a public employer to
agree to grievance or disciplinary procedures proposed by the union.
It simply obligates the public employer to bargain in good faith
regarding such procedures."

Moreover, in *Grand Rapids v Grand Rapids Lodge No 97, Fraternal
Order of Police,* 415 Mich 628, 637; 330 NW2d 52 (1982), we noted
regarding the issue of grievance resolution, "If they cannot agree,
their only statutory duty is to continue to negotiate—that is the
statutory right; there is no statutory right to binding arbitration."
Where no method or procedure has been agreed upon to resolve
grievances, "the parties must simply negotiate on the grievance in
good faith." *Id.* at 635.

parties suggest. Public employees possess certain rights not enjoyed by private employees. They have the protection of the Due Process Clause in many attributes of their employment, *Bd of Regents of State Colleges v Roth,* 408 US 564; 92 S Ct 2701; 33 L Ed 2d 548 (1972); *Perry v Sindermann,* 408 US 593, 601-602; 92 S Ct 2694; 33 L Ed 2d 570 (1972). Public employers and employee pensions are financially secure in ways not always realized in the private sector. Additionally, employer decisionmakers in the public sector either are popularly elected officials or persons who answer to popularly elected officials. The nature of public service is such that citizens are more likely to have an active interest in a labor dispute involving the education of their children or the collection of the trash than they are in a dispute involving one of many alternate suppliers of commercial goods or services. This public concern, plus access to the decisionmakers, gives the employees a source of direct influence not generally found in the private sector bargaining.

Nor are public employees left without a means of resolving grievances. Grievances can go to the bargaining table to be resolved during negotiations, or perhaps by a retroactivity clause in the new agreement.[14] In some instances, as suggested in *Litton,* a grievance itself might be pursued as an unfair labor practice charge.

[14] At the MERC hearing in the present case, the union representative testified that the school district never refused to meet with the union to discuss grievances and that all grievances were discussed at the bargaining table or at some other point during the negotiation period. The school district's continual processing and discussions of filed grievances supports the inference that the school district sought to avoid committing an unfair labor practice. See *Int'l Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, Local Union 1199 v Pepsi-Cola General Bottlers,* 958 F2d 1331, 1336 (CA 6, 1992); *United Paperworkers Int'l Union AFL-CIO, CLC v Wells Badger Industries, Inc,* 835 F2d 701, 704-705 (CA 7, 1987).

The public employer's situation, like the public employee's, is different from that of the private sector employer. The public employer frequently has less control than its private sector counterpart over its income and expenses. The public employer is dependent on the electorate to approve new revenues from taxes. This frequently results in a situation in which the public employer and its employees find themselves aligned in proposing and supporting requests to the electorate to approve additional tax millages. One salutary effect of these alliances is that the affected public employers and employee unions have additional incentive to negotiate mutually satisfactory resolutions to postexpiration grievances.

Finally, despite the fact that the PERA prohibits strikes by public employees, MCL 423.202; MSA 17.455(2), we would be less than candid if we did not acknowledge that in the real world of public employment, public employees occasionally assume the power to strike.[15] Thus, from the employer's perspective, there is value in securing a more stringent contractual agreement with the union prohibiting the employees from striking during the term of the contract while affording it more remedies for breach of that agreement than those provided by the PERA.

In summary, while the nature of the balance of negotiating power in the public sector is different than that in the private sector, we find no evidence of legislative intent to strike a different balance regarding arbitration as essentially consensual. Nor can we agree with the charging par-

---

[15] Such statutory mandates discourage strikes but clearly do not prevent them. Kearney, Labor Relations in the Public Sector (2d ed), p 287. It has been estimated that since 1960 more than ninety percent of all government strikes have taken place at the local level, with eight percent at the state level and one percent at the federal level. *Id.* at 276.

ties that public employees are so clearly disadvantaged as to compel a different result.

The accusation that we are abandoning established precedent, *post,* p 352, is simply wrong. The instant case is one of first impression. The only Michigan authority on this point is the decision of the Court of Appeals and the decision of MERC in this and other cases, all of which reach the conclusion that there is no statutory obligation to arbitrate. Moreover, the general state authority relied on by the dissent are decisions of this Court adopting federal labor law in Michigan. The dissent erroneously cites *CMU, Jaklinski, DPOA,* and *PPOA* for the proposition that established Michigan precedent exists interpreting the PERA and reliance on federal labor interpretations is therefore inappropriate. However, we note that *CMU* and *DPOA* relied on *NLRB v Borg-Warner Corp,* 356 US 342; 78 S Ct 718; 2 L Ed 2d 823 (1958), and *Fibreboard Paper Products Corp v NLRB,* 379 US 203; 85 S Ct 398; 13 L Ed 2d 233 (1964). *Jaklinski* followed *Nolde Bros,* and *PPOA,* in which there was no majority opinion, followed *DPOA.*

Nor do we discern in the dissent, any attempt to weigh or explain how the policy considerations underlying the decision in *Litton* and that of the MERC, can be harmonized with its result. These considerations, strongly supported by precedent in state law, are the consensual nature of arbitration and adherence to the essential nature of the NLRA and the PERA that provide a process by which the parties might reach agreement.

Thus on the basis of legislative intent, a weighing of the policy considerations underlying arbitration, and federal and state precedent, we find that the Court in *Litton,* and the MERC in this case, reached the correct conclusion that there is no

statutory duty to arbitrate after expiration of a collective bargaining agreement.

### C

Finally, the syllogism on which the dissent rests, requires additional response. Stripped of the inaccurate observations that precedent and "the Legislature's command," *post,* p 353, require its result, the dissent rests on the following propositions. Grievance arbitration is a mandatory subject of bargaining. An employer must bargain to impasse regarding mandatory subjects of bargaining. Therefore arbitration survives expiration of the collective bargaining agreement as a statutory term of the contract.

It should be obvious that it does not necessarily follow from the fact that arbitration is a mandatory subject of bargaining, that arbitration is one of those mandatory subjects of bargaining that is a part of the statutory contract. That is the question presented by this case, and the syllogism posed does not address it. Thus, the dissent offers no explanation why it would eliminate the duty imposed by the PERA to bargain in good faith over grievances that arise in the absence of a collective bargaining agreement, in favor of resolution by a third-party arbitrator.

The dissent buttresses its syllogism with reference to the lack of an employer "quid" for the employees "quo," that is historically inaccurate. The PERA represents an enlightened legislative approach to public employment that amended prior law. Previously, any public employee who went on strike was deemed to have abandoned the position and all attendant benefits. Criminal sanctions were imposed for inciting, influencing, coercing, or urging another to strike, MCL 423.201 *et*

*seq.*; MSA 17.455(1) *et seq.* The PERA granted public employees the right to organize and to insist that public employers bargain in good faith over wages, hours, and conditions of employment, while retaining the prohibition on strikes. Thus, if there is any bargain concerning the loss of the power to strike, the "quid" is the public employer's obligation to bargain in good faith in return for the continued prohibition of strikes.[16]

The *Litton* decision and the MERC decision are consistent with this approach. Public employers and employees have to bargain in good faith about grievances that arise while there is no collective bargaining agreement and employees have a potential unfair labor practice charge against the employer for unilateral change in working conditions. The PERA does not, however, impose arbitration, which is merely a method of determining a dispute involving some other substantive right, on the bargaining process as a term of the statutory contract.

D

The second source of an obligation to arbitrate discussed in *Litton* is the collective bargaining agreement itself. The seminal case on this topic is *Nolde Bros, supra.* The Court in *Nolde Bros* held that there may be some disputes that arise after the expiration of a collective bargaining agreement that involve rights granted under the agree-

---

[16] We observed in *Detroit Police Officers Ass'n v Detroit,* 428 Mich 79, 95; 404 NW2d 595 (1987) (opinion of BOYLE, J.):

   The resolution of labor-management strife in the public sector through collective bargaining is a basic goal of the PERA, which joins the strike proscription, MCL 423.202; MSA 17.455(2), with the employer's duty to bargain collectively, MCL 423.215; MSA 17.455(15).

ment. These disputes, governed by the agreement, would still be arbitrable under an arbitration clause of the otherwise expired agreement. The rights are those that the parties intended to last beyond the expiration date of the agreement. The scope of those rights was subject to debate among the lower federal courts, see *Ottawa Co v Jaklinski, supra* at 15-21, explaining the various approaches. *Jaklinski* was decided during the debate. For reasons discussed in *Jaklinski,* a majority of this Court decided that the proper application of *Nolde Bros* to the PERA was that "the right to grievance arbitration survives the expiration of the collective bargaining agreement when the dispute concerns the kinds of rights which could accrue or vest during the term of the contract." 423 Mich 22.

In *Litton,* the Court ended at least the initial round of the debate on the scope of *Nolde Bros* in a fashion identical to our decision in *Jaklinski.* The Court stated:

> A postexpiration grievance can be said to arise under the contract only where it involves facts and occurrences that arose before expiration, *where an action taken after expiration infringes a right that accrued or vested under the agreement,* or where, under normal principles of contract interpretation, the disputed contractual right survives expiration of the remainder of the agreement.[17] [111 S Ct 2225. Emphasis added.]

The charging parties invite us to "declare that *Jaklinski*'s concept of 'accrued' or 'vested' rights extends to all provisions of an expired agreement

---

[17] It may appear that the Court is listing three types of postexpiration disputes. We believe, strictly speaking, there is only one. The employer action or inaction leading to the first listed dispute arises before expiration. The third listed dispute arises before the expiration of the clause of the agreement applying to that dispute.

which represents the core of the relationship between the parties." They do not, however, indicate where to draw the line on which rights are or are not "core," choosing only to point to rights found by lower federal courts to be accrued or vested, such as vacation days, pensions, health and disability insurance, and seniority. Leaving aside whether these are the types of rights that would be vested in a given case, we note that they are not the types of rights subject to the grievances in this case. The grievances filed on behalf of the transportation unit involved assignment of runs, payment for runs, working hours, payment for layover time, and schedule changes. The grievances filed on behalf of the custodial-maintenance unit involve out-contracting, failure to have a unit member in attendance at a school sponsored event, and assignment of one position. These involve the traditional areas of wages, hours and working conditions, in other words, the mandatory subjects of bargaining. This is identical to one of the approaches we rejected in *Jaklinski* and the approach for the statutory obligation that we reject above.

The charging parties also argue that the testimony of their witness shows that the parties intended that the collective bargaining agreements were to continue in effect throughout the negotiations. The evidence relates to events that occurred after the expiration of the agreement. It does not show any intent by the signers of the agreements that the agreements provided for any terms to last beyond the expiration date. Thus, any right to arbitrate grievances in this case did not derive from the original agreement in the manner of *Nolde Bros.* At most, there may have been a temporary side agreement made during negotiations, but the charges filed in this case did *not*

allege a violation of any side agreement and the charging parties did not take exception to the hearing referee's failure to find such an agreement. We do not believe any contention about a separate agreement is preserved for appellate review.

The charging parties have not argued that the grievances filed meet the "accrued or vested" test of *Litton* and *Jaklinski*. Thus, we do not discuss that question.[18]

III

We hold that the PERA does not create a statutory duty to arbitrate grievances arising after the expiration of a collective bargaining agreement. We also find that the grievances filed in this case were not the type that accrued or vested under the previous collective bargaining agreement. Accordingly, we affirm the decision of the Court of Appeals.

BRICKLEY, RILEY, and GRIFFIN, JJ., concurred with BOYLE, J.

CAVANAGH, C.J. (*dissenting*). I dissent from the majority's holding "that an agreement to arbitrate does not survive expiration of a collective bargaining contract statutorily as a term or condition of employment under the public employment relations act" because of "the strong precedent favoring arbitration as . . . consensual." *Ante,* p 328. Our holding in *Central Michigan Univ Faculty Ass'n v Central Michigan Univ,* 404 Mich 268, 277;

---

[18] *Litton* had two dissenting opinions, each of which contended that the determination whether the contractual rights survived the expiration of the collective bargaining agreement was a matter to be initially determined by an arbitrator. We need not and do not reach that issue in this case.

273 NW2d 21 (1978), compels the application of the unilateral preimpasse doctrine to mandatory subjects of bargaining. Because arbitration is a mandatory subject of bargaining, I would apply the unilateral preimpasse doctrine to the case at bar.

I

The inquiry whether the contractual provision for arbitration survives the expiration of the contract does not stop, with an examination of its viability under the contract.[1] Instead, the Court must also determine whether the PERA provides life support to the arbitration clause.

Section 15[2] of the PERA compels a public employer to bargain collectively with its employees' representatives. Additionally, the statute directs a public employer to participate in collective bargaining in "good faith with respect to wages, hours, and other terms and conditions of employment . . . ." This Court has held that "other terms and conditions of employment" are referred to as " 'mandatory subjects' of bargaining." *CMU Faculty,* p 277. "Once a specific subject has been classified as a mandatory subject of bargaining, the parties are required to bargain concerning the subject, and neither party may take unilateral action on the subject absent an impasse in negotiations." *Id.*

Accordingly, when determining whether the PERA prohibits unilateral action affecting an established practice, the Court must determine (1)

[1] A contractual provision can remain viable, pursuant to the expired contract, if (1) the parties expressly agreed to the terms, or (2) the contractual claim vested or accrued before the contract's expiration. The agreement to arbitrate, however, failed to survive under either of these methods.

[2] MCL 423.215; MSA 17.455(15).

whether the established practice is a mandatory subject of bargaining, and (2) whether negotiations have reached an impasse. See *id.* If the Court concludes that the established practice is a mandatory subject of bargaining and negotiations have yet to reach an impasse, then *CMU Faculty* directs the Court to apply the preimpasse unilateral change doctrine.[3] In the case at bar, there was not an impasse in negotiations at the time the appellee extinguished the grievance procedure of arbitration. Thus, the only inquiry remaining is whether arbitration is a mandatory subject of bargaining.

The majority concedes that "[t]his jurisdiction has similarly deemed grievance procedures and arbitration as mandatory subjects of bargaining. See *Ottawa Co v Jaklinski,* 423 Mich 1; 377 NW2d 668 (1985); *Pontiac Police Officers Ass'n v Pontiac (After Remand),* 397 Mich 674; 246 NW2d 831 (1976)." *Ante,* p 337, n 9. Despite the majority's acknowledgment of established precedent, it announces that arbitration, while a mandatory subject of collective bargaining, is judicially excluded from the preimpasse unilateral change doctrine.

II

Before today's holding, this Court has not dimin-

---

[3] In *Ottawa Co v Jaklinski,* 423 Mich 1, 13; 377 NW2d 668 (1985), this Court recognized the logical conclusion compelled by prior precedent.

> Under this line of reasoning, it logically follows that as part of its duty to bargain in good faith the joint employers had a duty prior to reaching impasse not to unilaterally alter the grievance arbitration mechanism . . . .

The Court did not examine the propriety of the logical conclusion compelled by Michigan precedent, instead, it rejected the plaintiffs asserted § 15 claim because (1) the plaintiff's grievance arose after negotiations had reached an impasse, and (2) the plaintiff failed to follow the proper procedure for filing her § 15 claim.

ished the Legislature's command that public employers bargain "in good faith with respect to wages, hours, and other terms and conditions of employment . . . ."[4]   MCL   423.215;   MSA 17.455(15). I would adhere to the practice of applying the preimpasse unilateral change doctrine to mandatory subjects of bargaining. See *CMU Faculty.* Furthermore, I reject the majority's application of federal precedent interpreting § 8(d) of the NLRA, to § 15 of the PERA, in this instance.

The majority finds support for its position mainly in federal precedent interpreting § 8(d) of the National Labor Relations Act,[5] 29 USC 158(d). Admittedly, this Court has looked to federal precedent interpreting the NLRA when construing the PERA in the past.[6] Reliance on federal cases is not appropriate in the case at bar, however, because it

---

[4] In fact, before today this Court had vigorously advanced the mandates of the PERA: *CMU Faculty,* p 279 (The "PERA was intended by the Legislature to supersede conflicting laws and is superimposed even on those institutions which derive their power from the Constitution itself "); *Pontiac Police Officers Ass'n v Pontiac,* 397 Mich 674; 246 NW2d 831 (1976) (A majority of the Court concluded that the mandates of the PERA prevail over contrary provisions of the charter of a home-rule city); *Rockwell v Crestwood School Dist Bd of Ed,* 393 Mich 616, 628-629; 227 NW2d 736 (1975) (The mandates of the PERA prevail over conflicting provisions of the teacher tenure act); *Wayne Co Civil Service Comm v Bd of Supervisors,* 384 Mich 363, 371; 184 NW2d 201 (1971) (The PERA supersedes conflicting provisions of the county civil service act).

[5] In *Litton Financial Printing v NLRB,* 501 US 190; 111 S Ct 2215; 115 L Ed 2d 177 (1991), the United States Supreme Court held that arbitration is not subject to the NLRA's preimpasse unilateral change doctrine because arbitration arises by consent and not by operation of law.

[6] Although we cannot state with certainty, it is probably safe to assume that the Michigan Legislature intentionally adopted § 15 PERA in the form that it did with the expectation that MERC and the Michigan courts would rely on the legal precedents developed under NLRA, § 8(d) to the *extent that they apply to public sector* bargaining. [*Detroit Police Officers Ass'n v Detroit,* 391 Mich 44, 53; 214 NW2d 803 (1974). Emphasis in original.]

is not concerned with the PERA and its effect on *public employees.* Contrary to the majority's assertion, the PERA's prohibition against strikes by public employees[7] and the possible penalties faced by public employees who choose to strike,[8] places public employees in a disadvantaged position as compared to their private sector counterparts, warranting broad protection under § 15 of the PERA. Thus, their status as public employees[9] compels rejection of federal precedent interpreting the NLRA and its effect on private employees in this instance.[10]

The majority supports its position with the premise that the availability of interest arbitration under 1969 PA 312[11] somehow diminishes the rights afforded to public employees under § 15 of the PERA. The majority states:

> Additionally, and most importantly, the Legislature has made the determination when, after expiration of a collective bargaining agreement, public employees' lack of the right to strike creates an imbalance of power that is contrary to public

[7] MCL 423.202; MSA 17.455(2).

[8] See, generally, *Rockwell,* n 4 *supra,* p 628 (The PERA allows a public employer to terminate or discipline a public employee striking in violation of the PERA).

[9] While it is true that the MERC has announced a policy similar to that found in the federal cases interpreting the NLRA, such an interpretation, while persuasive, is not binding upon this Court. We must refrain from perpetuating agency interpretations that are hostile to the clear mandate of the Legislature.

[10] "[W]e must keep in mind that because public employees in Michigan are forbidden to strike, 'section 15 of PERA must be even more expansively construed than its NLRA counterpart' in order to adequately protect public employees' rights." [*Central Michigan Univ Faculty Ass'n v Central Michigan Univ,* 75 Mich App 101, 113; 254 NW2d 802 (1977) (CAVANAGH, P.J., dissenting), rev'd 404 Mich 268; 273 NW2d 21 (1978).]

[11] 1969 PA 312; MCL 423.233; MSA 17.455(33).

interest. It determined that an imbalance affected only certain types of public safety employees, whom it gave the right to interest arbitration in 1969 PA 312; MCL 423.233; MSA 17.455(33). It thus appears that the Legislature did not believe that a purported imbalance in other public sector employment required adjustment. [*Ante,* p 342.]

What the majority fails to acknowledge is that "Act 312 was clearly intended to supplement PERA." *Local 1277, AFSCME v Center Line,* 414 Mich 642, 652; 327 NW2d 822 (1982). Section 15 of the PERA prevents a preimpasse unilateral change in mandatory subjects of bargaining. Once an impasse is reached, however, a public employer can unilaterally change mandatory subjects of bargaining. Act 312 picks up where § 15 of the PERA left off, providing additional protection to public safety employees. Act 312 is "directed toward the resolution of major collective bargaining impasses and the prevention of police and fire department employee strikes." *Local 1518, AFSCME v St Clair Co Sheriff,* 407 Mich 1, 12-13; 281 NW2d 313 (1979). While Act 312 obviously provides supplemental protection to public safety employees,[12] it does not detract from the protections afforded to all public employees under § 15 of the PERA.

Finally, the majority's treatment of this issue effectively nullifies the protections afforded under the PERA. This Court recognized that an employee may retain rights afforded under an expired contract on the basis of either (1) a contractual

[12] After "Act 312" interest arbitration is invoked, neither party to the dispute may alter existing "wages, hours, [or] other conditions of employment" without the consent of the other during the pendency of proceedings before the arbitration panel. [*Jaklinski, supra,* p 14.]

claim,[13] or (2) the statutory right to "good-faith bargaining" under § 15 of the PERA. *Ottawa Co v Jaklinski,* 423 Mich 1, 12-13; 377 NW2d 668 (1985).[14] Under the majority's approach, a right to arbitration can exist only under a contract theory, which, of course, vitiates the protection afforded to public employees by the Legislature.

> If the Legislature deems it appropriate to re-define the scope of collective bargaining obligation of the public employers generally or of particular public employers and the representatives of their employees to include "wages, hours, and *some* other terms and conditions of employment," it may do so.
>
> This Court cannot properly decide ad hoc that what has uniformly been regarded a "condition" of employment is not such a condition as applied to a particular public employer although it continues to be such a condition for other employers, public and private. By eschewing redefinition, we under-score the prerogative of the Legislature to give such consideration as it deems warranted to the claims of public employers that the scope of the collective bargaining obligation impinges unduly on their power to govern. [*CMU Faculty,* p 280, quoting *Pontiac Police Officers Ass'n v Pontiac (After Remand),* 397 Mich 674, 684; 246 NW2d 831 (1976) (opinion of Levin, J.). Emphasis in original.]

## III

It is clear that arbitration is an "other term and

---

[13] See n 1.

[14] It is true that public employers are required to bargain in good faith to impasse regarding "wages, hours, and other terms and conditions of employment." MCL 423.215; MSA 17.455(15). Because "wages, hours, and other terms and conditions of employment" are regarded as mandatory subjects of bargain-ing, once a party negotiating a collective bargaining agreement proposes such a subject, neither party may take unilateral action regarding it prior to impasse. *Detroit Police Officers Ass'n v Detroit,* 391 Mich 44, 54-55; 214 NW2d 803 (1974).

condition of employment" that cannot be unilaterally changed absent an impasse in negotiations. Because the appellee unilaterally changed the arbitration process before reaching an impasse in negotiations with the newly certified union, it violated the PERA. Accordingly, I would reverse the holding of the Court of Appeals.

LEVIN and MALLETT, JJ., concurred with CAVANAGH, C.J.